**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| IMAN KHALIL SURADI, AKA Iman Suradj, | No.   14-71463 |
| Petitioner, | Agency No. A089-859-189 |
| v. | MEMORANDUM* |
| JEFFERSON B. SESSIONS III, Attorney General, | |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 20, 2017
San Francisco, California

Before:  THOMAS, Chief Judge, MURGUIA, Circuit Judge, and BAYLSON,**
District Judge.

Iman Khalil Suradi, a native and citizen of Jordan, appeals for the second

time the Board of Immigration Appeals' ("BIA") denial of her application for

---

\*       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\*       The Honorable Michael M. Baylson, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

deferral of removal under the Convention Against Torture ("CAT"). We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(4), which "encompasses legal and constitutional issues arising from claims for deferral of removal under CAT." *Maldonado v. Lynch*, 786 F.3d 1155, 1160 (9th Cir. 2015) (en banc) (citing 8 U.S.C. § 1252(a)(2)(D)).

This case returns to us after we had concluded that "the record compels the conclusion that it was more likely than not that Suradi will be subject to an honor killing by her family or estranged husband" if she returned to Jordan. *Suradi v. Holder*, 437 Fed. App'x 549 (9th Cir. 2011). We also determined that the agency had misread the State Department report on whether the country acquiesces in honor killings and remanded for further proceedings. *Id.*

Despite the contrary conclusion of the Immigration Judge and the BIA, the record here also compels the conclusion that the government of Jordan acquiesces to honor killings. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1188 (9th Cir. 2003) (quoting 8 C.F.R. § 1208.18(a)(1)).

To assess the status of honor killings in Jordan with up-to-date information, the BIA remanded the record to the Immigration Judge. The government submitted the State Department's 2011 Country Report, two news articles–one undated and the other from 2010, and an excerpt from a 2009 report on the

2

International Federation for Human Rights ("FDIH") website. Suradi submitted five articles dating from 2012, 2009, and 2007, as well as a 2009 letter from Human Rights Watch to Jordan's Minister of Justice, and a 2009 Human Rights Watch report. Neither the Immigration Judge nor the BIA discussed Suradi's credible testimony. Based on the materials submitted, the Immigration Judge concluded that "the country condition documents show [] that the government of Jordan actively intervenes to protect potential victims of honor killings." The BIA summarized much of the Immigration Judge's analysis and found no clear error in that conclusion.

Yet, according to the 2011 Country Report, "violence against women" is among Jordan's "three most significant continuing human rights problems." Moreover, "more than 10 honor crimes were reported during the year," but that the number may be higher because many such crimes go unreported. And although honor crime perpetrators routinely receive sentences of up to 15 years initially, as of 2011, a reviewing court still "generally decreased the sentences by half." The undated Freedom House article noted that despite Jordan's progress in women's literacy and gains in women holding political office, "violence against women remains widespread as does impunity in cases of spousal abuse or so-called 'honor killings.'" The FDIH praised a 2009 law attempting to protect women from

3

domestic violence, but warned that "[c]onsistent monitoring has proved that judges often take a lenient view in cases of 'honour killings,' especially when the perpetrators come from the woman's family."  Continuing, FDIH wrote:

> So-called honour crimes still occur commonly and the perpetrators are not regarded as criminals but benefit from the clearly discriminatory "extraordinary circumstances" clause in the Penal Code.  Adding insult to injury, the endangered women are jailed for their protection, and their release can only be granted by one of her male relatives.

Also in 2009, Human Rights Watch wrote an open letter to Jordan's Minister of Justice, expressing continuing concern that "'honor' killings in Jordan claim an average of 25 women's lives every year according to a recent study (June 2009)," and that this "unchanged, and perhaps even slightly rising, number of victims of 'honor' killings shows that Jordan's past efforts to battle this scourge have not borne fruit."

On administrative appeal, the BIA recited several of the Immigration Judge's findings, noting that "the country condition evidence in the record reflects that the government of Jordan actively intervenes to protect potential victims of honor killings," and that "women who are in danger of honor killings are placed in protective custody to prevent their attackers from harming them."  This observation omits the fact that such protective custody is involuntary, and often involves extended incarceration in jail.  The BIA also noted that, in addition to requiring

4

families to guarantee a potential victim's safety, "both the governor and the potential victim must agree to the end of the protective custody." the BIA did not acknowledge that last year, at least one woman was killed after being released from protective custody.

While acknowledging that "in 2009, the Justice Ministry announced its intention to establish a special tribunal to hear cases involving honor killings and the Jordanian government began to work with non-governmental organizations to educate legal officials and to establish procedures to address the issue," the BIA did not mention the several articles suggesting the situation in Jordan has yet to actually improve. Nor did the BIA point to any attempts by the Jordanian government to implement changes to the legal structure advocated by activists. Finally, the BIA again ignored Suradi's credible testimony, *see Suradi I*, 437 Fed. App'x at 551 ("Because the IJ did not make an adverse credibility finding in Suradi's removal hearings, the BIA was required to accept Suradi's testimony, and all reasonable inferences to be drawn from it, as true.") (citing *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1056 (9th Cir. 2006)), even though this Court had previously admonished it to do so, *id.* at 553. Suradi testified that she had reported her husband's abuse to the police, and to the Mayor of Amman, to no avail. She also testified to a firm belief that she would be killed if she were returned to

5

Jordan, and that the government would not and could not protect her. *See Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2013) (citing *Ornelas–Chavez*, 458 F.3d at 1059 (quoting 8 C.F.R. § 1208.18(a)(7))) ("Public officials acquiesce in torture if, 'prior to the activity constituting torture,' the officials: (1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are unable or unwilling to oppose it.").

As the Seventh Circuit expressed in a similar case, we find ourselves "at a loss to understand how [the BIA and Immigration Judge] came to this conclusion in light of the evidence we have just reviewed." *Sarhan v. Holder*, 658 F.3d 649, 660 (7th Cir. 2011).

In short, the record compels the conclusion that (1) Suradi is more likely than not to be subject to an honor killing if removed to Jordan and (2) the Jordanian government acquiesces in significant violence against women, including honor killings. Accordingly, we grant her petition and remand to the BIA for further proceedings consistent with this disposition.

**PETITION GRANTED; REMANDED.**