RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OLGA JAD KAMAR,

*Petitioner,*

*v.*

No. 16-3750

JEFFERSON B. SESSIONS, III, Attorney General,

*Respondent.*

On Petition for Review from the Board of Immigration Appeals.
No. A 096 419 405.

Decided and Filed:  November 17, 2017

Before:  MERRITT, MOORE, and ROGERS, Circuit Judges

_____

## COUNSEL

**ON BRIEF:**  George P. Mann, Maris J. Liss, GEORGE P. MANN AND ASSOCIATES, Farmington Hills, Michigan, for Petitioner.  John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

MERRITT, Circuit Judge.  Petitioner Olga Jad Kamar filed an application for withholding of removal under the Immigration and Nationality Act and protection under the Convention Against Torture.  The Immigration Judge denied the application and ordered her removed from the United States to Jordan, or in the alternative, to Lebanon.  The Board of Immigration Appeals dismissed her appeal and denied her motion to remand based on changed country conditions.  This petition for review followed.

The issue is whether a woman who will either be subject to an "honor killing," or alternatively, "protective custody" in Jordan is entitled to relief. For the reasons set forth below, we **GRANT** the petition for review and **REMAND** the case to the Board for further proceedings consistent with this dopinion.

## I. BACKGROUND

### A. Factual Background

Kamar is a native of Lebanon and a citizen of Jordan. She was born in Lebanon in 1964, but moved to Jordan as a young child. Kamar and her family are Catholic, but adhere to Islamic cultural practices and societal traditions. Kamar's mother and sister are United States citizens. Her mother lives in Jordan and her sister lives in New Orleans. Kamar's other siblings and cousins live in Jordan.

Kamar was admitted to the United States as a B-2 visitor in June 1999. She changed her status to an F-1 student in January 2001 to pursue a master's degree. Kamar's F-1 status was terminated when she became pregnant and left school. Kamar has three sons with her husband from her first marriage, which ended in divorce in 2006. Their three sons live in Canada with their father. In 2007, Kamar became pregnant again. She married her second husband two months before her child was born. The child is a United States citizen and is now ten years old. Kamar has no relationship with her second husband and has an order of protection against him.

### B. Procedural Background

On October 12, 2007, the Department of Homeland Security charged Kamar as removable pursuant to 8 U.S.C. § 1227(a)(1)(C)(1) because she failed to comply with the conditions of her F-1 student status. Kamar conceded removability. She filed an application for withholding of removal pursuant to the Immigration and Nationality Act ("Act"), protection under the Convention Against Torture ("Convention"), and voluntary departure in the alternative.[1] In her application, Kamar alleged that if she returned to Jordan, under Islamic

---

[1]It appears that Kamar did not apply for asylum, although there is some confusion on this point in her brief. However, she petitions this Court to "reverse the denial of the motion to reopen so [she] can apply for the superior relief of asylum."

tradition, she would be subject to an honor killing by her youngest male relative for bringing shame to her family by getting pregnant out of wedlock.

There was a merits hearing on Kamar's application on June 8, 2009. At the hearing, Kamar testified that her family did not approve of her divorcing her first husband and conceiving her fourth son while unmarried. She explained that the fact that she married her second husband before giving birth was irrelevant because she got pregnant *before* marriage. Her brothers have not spoken to her since this occurred.

Kamar testified that she fears returning to Jordan because her cousins intend to perform an honor killing on her and her child in accordance with Jordanian custom. She explained that even though her family is Catholic, they live in Jordan where the majority of people are Muslim and the law is according to Islamic law. Her family follows the local traditions. In Jordanian society, if a woman shames her family, the solution is to cleanse the family and restore its honor by killing her.

While Kamar has not had physical contact with her cousins, she testified that she received letters claiming that her cousins want to kill her and that she was told this by numerous relatives and friends. In support, she submitted a letter from her mother dated September 5, 2009, saying that Kamar's first cousin, Alias, is the cousin that is the angriest with her. It stated, "[Alias] told your sisters that he wished God took his life if he did not finish this work. Even if this was the last thing that he would do on this earth, he will kill you for your sisters." The other letter Kamar presented was from Alias. It said, "You understand what the punishment is for a girl like you, who brings shame upon our family. Your day of punishment is coming and with God's blessing it will be very soon."

Kamar testified that if she attempted to seek help from the Jordanian government, it would place her in prison and place her son in an orphanage for protection. She said she could not relocate in Jordan, because it is a small country where everyone knows each other. Also, she is well known in the country because she used to be a teacher there and had a business. Kamar testified that she could not alternatively move to Lebanon because she does not have a visa to be

admitted into any other country. Additionally, she stated that she has not been to Lebanon since she was one year old and was not allowed to visit when she once attempted.

Mona, Kamar's sister who is also divorced, testified that their family did not like the fact that she was divorced either, but had come to accept it. However, she said that because Kamar became pregnant outside of marriage, their cousins would kill her to restore their family's honor. She explained that it did not matter that Kamar subsequently married her second husband because Alias believes that Kamar cheated on her first husband with her second husband. This is due to a rumor spread by Kamar's first husband's family that reached Jordan. Mona asserted that if Kamar returned to Jordan, their cousins would find out and be waiting for her at the airport.

### 1. The First Decision and Appeal

On September 30, 2009, the Immigration Judge ("IJ") determined that Kamar was not credible and denied her application. Kamar appealed to the Board of Immigration Appeals ("Board"). The Board overturned the IJ's decision on August 3, 2012, finding that the overall adverse credibility finding was clearly erroneous. It remanded the case to allow the IJ to reconsider Kamar's applications and ordered further fact-finding since the IJ's previous analysis did not treat Kamar's testimony as credible.[2]

### 2. The Second Decision and Appeal

On June 28, 2013, the IJ again denied Kamar's application. He ordered her removal to Jordan, or in the alternative, to Lebanon. The IJ found that Kamar failed to establish a viable social group for relief under her withholding of removal application. Even if Kamar had shown this, the IJ reasoned that there was no evidence that a Catholic had been subject to an honor killing based on an illegitimate birth. He stated that the only instance of Christian honor killings in Jordan in the record was in a United Nations report discussing honor crimes and how they are based on Islamic teachings. Referring to the report, the IJ rationalized, "But it does note that there are instances where Christian families also commit honor crimes. Note it did not say honor

---

[2]However, the Board sustained the IJ's determination that Kamar was ineligible for voluntary departure.

killings." Thus, the IJ concluded that Kamar was unable to show that it was more likely than not that she would be persecuted based on her membership in a group.

Additionally, the IJ found the letter from Alias was not credible because it was undated and not the original. Even if it was credible, the IJ concluded that it did not facially indicate that Alias intended to kill Kamar. The IJ determined that this intent was only ambiguously stated in the letter from Kamar's mother and reasoned that nothing indicated that Alias still harbored this animosity. However, even if Kamar did have a legitimate fear of being killed, the IJ found that Kamar failed to show that her family or the Jordanian government would not protect her because the government had taken steps to protect victims of honor killings. He determined that Kamar also failed to show that she could not relocate.

As for the application for protection under the Convention Against Torture, the IJ denied Kamar's request after finding that Kamar could not show that it was more likely than not that she would be tortured by anyone, let alone somebody covered by the Convention.

Kamar again appealed the IJ's decision to the Board. On January 15, 2015, the Board affirmed the IJ's decision and dismissed the appeal.

On April 15, 2015, Kamar filed a motion to reopen with the Board requesting that it reopen proceedings (due to changed country conditions and new law) and remand the case. On June 19, 2015, the Board vacated its January 15, 2015, decision and reinstated Kamar's original appeal. It denied Kamar's motion to reopen as moot and ordered further briefing. Kamar's brief in support of her reinstated appeal included a motion to remand based on changed country conditions.

### 3. *The Board's Third Decision*

On June 2, 2016, the Board affirmed the IJ's decision and dismissed the reinstated appeal and motion to remand. It concurred with the IJ's denial of withholding of removal, finding that Kamar did not meet her burden of establishing that future persecution in Jordan was objectively reasonable. It also reasoned that the 2013 and 2014 country reports for Jordan submitted by

Kamar with her motion to reopen and reinstated appeal showed only continuing country conditions rather than changed conditions.

The Board stated that the IJ correctly determined that Kamar did not demonstrate a pattern or practice of persecuting persons similarly situated to her, and that aside from a notarized letter referring to Christian honor killings in Jordan, there were no documents in the record showing a pattern or practice of this occurrence. In light of this finding, the Board determined that it did not need to discuss the IJ's finding related to Kamar's failure to establish a particular social group.

Further, the Board found that the IJ did not commit clear error in finding that the Jordanian government was not unable or unwilling to protect Kamar. The Board reasoned that the IJ considered the 2011 country report noting that the authorities in Jordan had placed eighty-two women in protective custody that year to prevent them from becoming victims of honor killings. The Board found that subsequent country reports further supported the IJ's finding that the Jordanian government is working to protect victims and actively prosecute the perpetrators of honor crimes. The Board did not address Kamar's ability to relocate.

The Board additionally upheld the IJ's denial of Kamar's request for protection under the Convention. It determined that Kamar did not demonstrate that she faced a clear probability of torture in Jordan by or at the instigation of or with the consent or acquiescence or willful blindness of the government.[3]

In this petition for review, Kamar requests that we reverse the denial of the motion to remand so that she may apply for asylum based on changed country conditions; or, in the alternative, reverse the denial of removal under the Immigration and Nationality Act or relief under the Convention Against Torture.

---

[3]The Board also addressed Kamar's eligibility for voluntary departure and Deferred Action for Parents of Americans, which are not relevant to the appeal at hand.

## II. ANALYSIS

### A. Jurisdiction

We have jurisdiction under 8 U.S.C. § 1252 to review the Board's final determination regarding an order of removal. *Harmon v. Holder*, 758 F.3d 728, 732 (6th Cir. 2014).

### B. Standard of Review

We apply the same standard of review for withholding of removal claims made under the Immigration and Nationality Act and for requests for protection under the Convention Against Torture. When, as here, the Board reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, this Court reviews the Board's decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But, to the extent the Board adopted the IJ's reasoning, we also review the IJ's reasoning. *Id.*

We review the factual findings under the substantial evidence standard and consider whether they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citation omitted). These findings are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review the legal conclusions de novo, but defer to the agency's reasonable interpretations of its own precedents. *See Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005).

On appeal, Kamar makes two main arguments. First, she argues that the Board's decision that the Jordanian government would be able and willing to protect her was not supported by substantial evidence and thus the Board erred in finding her ineligible for withholding of removal under the Immigration and Nationality Act. Second, Kamar asserts that the Board's decision erred as a matter of law in finding that the Jordanian government's policy of involuntary incarceration does not violate the Convention Against Torture.

## C. Withholding of Removal Under the Immigration and Nationality Act

Withholding of removal under § 241(b)(3)(A) of the Act is mandatory if an alien shows a "clear probability" that, if she was removed, her "life or freedom would be threatened" on a protected ground such as her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). A "clear probability" means that it is "more likely than not" that the alien would be subject to persecution if returned to the country of removal. *INS v. Stevic*, 467 U.S. 407, 429–30 (1984). A determination as to eligibility for withholding of removal is conclusive if supported by substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

The issue before us is whether substantial evidence supports the Board's conclusion that Kamar was ineligible for withholding of removal. Like the Board, we assume for purposes of this petition for review that Kamar was in fact a member of a particular social group for purposes of the statute. *See Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003), *modified on other grounds by Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). We must consider then whether substantial evidence supports the determination that Kamar has not "presented sufficient evidence to compel a finding that [she] would, more likely than not, be persecuted on the basis of that membership." *Id.* Our analysis of Kamar's eligibility for withholding of removal under the Act involves several of the same factors that we will later consider when addressing her request for protection under the Convention.

### 1. Particular Social Group

The Board did not address whether Kamar was a member of a "particular social group," and the parties do not address the issue in their appellate briefs. Under the Supreme Court's holding in *Gonzales v. Thomas*, 547 U.S. 183, 185–86 (2006), the Board must have an initial crack at that issue. Therefore, like the Board, we assume without deciding that Kamar has established membership in Kamar's professed particular social group. *See* A.R. 919. Kamar's professed particular social group is "women who, in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being killed or persecuted without any protection from the Jordanian government." A.R. 553,

citing *Sarhan v. Holder*, 658 F.3d 649, 654 (7th Cir. 2011). *Cf. Bi Xia Qu v. Holder*, 618 F.3d 602, 607–08 (6th Cir. 2010) (concluding that women who are sold or forced into marriage and involuntary servitude are a social group); *Al-Ghorbani v. Holder*, 585 F.3d 980, 996 (6th Cir. 2009) (approving proposed group of women who opposed the repressive and discriminatory Yemeni cultural and religious customs that prohibit mixed-class marriages and require paternal consent for marriage); *Yadegar-Sargis v. INS*, 297 F.3d 596, 603 (7th Cir. 2002) (identifying "Christian women in Iran who do not wish to adhere to the Islamic female dress code" as a particular social group).

### 2. *Persecution Because of Social Group Membership*

We next consider whether substantial evidence supports the Board's decision that it was not "more likely than not" that Kamar would be subject to persecution[4] in Jordan because of her membership in the particular social group. 8 C.F.R. § 1208.16(b)(2). Persecution is "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Khalili*, 557 F.3d at 436. Because her fear of persecution is attributable to non-government actors, Kamar must show that the government is unable or unwilling to protect her. *Id.* Kamar fails to meet her burden if she could avoid future threat to life or freedom by reasonably relocating to another part of Jordan. 8 C.F.R. § 1208.16(b)(2).

Additionally, withholding of removal is "not available to an alien who fears retribution *solely* over personal matters." *Al-Ghorbani*, 583 F.3d at 997 (quoting *Zoarab*). However, Kamar asserts that her life would be threatened because of Jordanian social norms that impose behavioral standards on women and permit family members to sentence those who violate these standards to death. While a family member may have a *personal* motivation to restore honor to his family, he carries out the honor killing because it is *socially* permissible. Thus, there is broader societal significance intertwined with the personal retribution.

---

[4]A showing of past persecution warrants a presumption that an alien's life or freedom would be threatened on account of a protected ground. 8 C.F.R. § 1208.16(b)(1) (2012). Kamar does not dispute that she has not shown any past persecution.

We now address, under the substantial evidence standard, the question of whether Kamar will be persecuted by threat of death if she returns to Jordan, which is relevant to both withholding under the Act and relief under the Convention. Kamar testified at the merits hearing that her cousins, specifically Alias, want to restore their family's honor by killing her, and her sister confirmed this. She knows this because of letters she received and communications with family and friends. The Board expressly found Kamar to be credible. On remand, the IJ concluded the letter from Alias was not credible and did not facially threaten Kamar. The IJ reasoned that even if it was credible, there was no indication that Alias knew that Kamar had gotten married and might not want to kill her anymore. The IJ found that the intent to kill Kamar was expressed only through an "ambiguous" comment in the letter from Kamar's mother. The Board agreed that Kamar did not establish that her fear of persecution was objectively reasonable.

The probability of harm occurring in these cases is an inference based on facts in the record. Considering the evidence, it is hard to reconcile these findings with the Board's conclusion that even if Kamar had a subjective fear of persecution, this fear was not objectively reasonable. There is nothing to cast doubt on Kamar's testimony. Even if the letter from Alias is not considered, the letter from Kamar's mother states that Alias wishes to kill Kamar even if it is his last act on earth, and credible testimony confirms this. Nothing indicates that Alias does not still intend to carry out the honor killing. Both Kamar and her sister testified that it did not matter that Kamar married her second husband because Alias knows that she had sexual relations outside of marriage and believes that she committed adultery. The record overwhelming supports the finding that she will be persecuted if she returns.

Finally, we consider whether the Jordanian government would be "unwilling or unable" to protect Kamar from harm. In the country reports in the record, it has been established that governors in Jordan routinely abuse the law and use imprisonment to protect potential victims of honor crimes. These victims are not released from imprisonment unless the local governor consents, the victim's family guarantees the victim's safety, and the victim consents. One non-governmental organization has provided a temporary, unofficial shelter as an alternative.

On the other hand, successful perpetrators of honor killings typically get their sentences greatly reduced. Additionally, if the victim's family, who is usually the family of the alleged perpetrator as well, does not bring the charges, the government dismisses the case. *See also Sarhan*, 658 F.3d at 657 ("After reviewing the evidence of the Jordanian government's treatment of honor crimes, we conclude that . . . the government is ineffective when it comes to providing protection to women whose behavior places them in the group who are threatened with honor killings.").

The Board's decision outlined the Jordanian government's efforts to combat honor crimes, including placing potential victims in "protective custody." As the Ninth Circuit concluded in an analogous case, "This observation omits the fact that such protective custody is involuntary, and often involves extended incarceration in jail." *Suradi v. Sessions*, No. 14-71463, 2017 WL 2992234, at *2 (9th Cir. July 14, 2017). While victim protection is necessary, incarceration is an insufficient solution. This practice is akin to persecuting the victim as she "must choose between death and an indefinite prison term." *Sarhan*, 658 F.3d at 659. Further, nothing in the record suggests that the country conditions in Jordan have changed such that the government will be able to adequately protect Kamar from being killed. This showing satisfies both of the standards for finding governmental action for purposes of withholding of removal under the Act and also those for protection under the Convention, as it amounts to "pain or suffering" that is inflicted with the acquiescence of a public official or a person acting in an official capacity.

We do not address whether Kamar can safely relocate to escape persecution, which is also relevant to withholding of removal and protection under the Convention. The Board did not mention relocation, and the parties' briefs do not address the issue. Like the particular social group inquiry, the issue of safe relocation must be addressed in the first instance by the Board. *Gonzales v. Thomas*, *supra*.

Substantial evidence does not support the Board's refusal to find that Kamar will probably be persecuted if she is returned to Jordan, due to her membership in the particular social group we discussed, or that the Jordanian government can or will do nothing to help her. The Board's decision with regard to those issues is reversed.

**D. Protection Under the Convention Against Torture**

To qualify for protection under the Convention, a petitioner must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Unlike withholding of removal, relief under the Convention is not conditioned on proof that the alien would be persecuted on a protected ground. In determining whether future torture is possible, we look at all relevant evidence such as:

> (i) evidence of past torture inflicted on the applicant; (ii) evidence that the applicant could relocate to a part of the country where he is likely not to be tortured; (iii) evidence of gross, flagrant or mass violations of human rights within the country to which the applicant will be removed; and, (iv) other relevant information about the country to which the applicant will be removed.

*Namo v. Gonzales*, 401 F.3d 453, 457 (6th Cir. 2005). The definition of torture includes:

> any act by which severe pain or suffering, whether physical or mental, is intentionally   inflicted on a person for such purposes as obtaining from him or her or a third person   information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent of acquiescence of a public official or other person acting in an official capacity.

*Singh v. Ashcroft*, 398 F.3d 396, 404–05 (6th Cir. 2005) (quoting 8 C.F.R. § 208.18(a)(1)).

Kamar alleges that she is eligible for relief because the Board erred as a matter of law in finding that the Jordanian government's policy of placing victims of honor crimes in "protective custody" does not violate the Convention. She argues that the government's policy of involuntary imprisoning targets of honor killings amounts to torture.

The Seventh Circuit has found that the Jordanian government's "solution" to protect honor killing victims is actually a form of punishing the victims of these crimes amounting to mental "pain or suffering," which is "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see Sarhan*, 658 F.3d at 659. Taking into account our reasoning and findings above on the factors relating to both withholding of removal under the Act and protection under

the Convention, we agree that "[d]espite the contrary conclusion of the Immigration Judge and the Board, the record here also compels the conclusion that the government of Jordan acquiesces to honor killings." *Suradi*, 2017 WL 2992234, at *1.

Given the likelihood that Kamar would be subject to involuntary imprisonment at the hands of the Jordanian authorities, resulting in mental pain and suffering, the Board erred in concluding that Kamar failed to establish that it was more likely than not that she would be tortured upon removal to Jordan. We grant the petition with respect to the Board's reasoning under the Convention.

**E. Motion to Remand**

We need not discuss the Board's denial of Kamar's motion to remand in light of the previous holdings.

**III. CONCLUSION**

For the reasons explained above, we **GRANT** the petition for review and **REMAND** to the Board for further proceedings consistent with this opinion.