NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0447n.06

Case No. 19-4157

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CANDELARIA JOSÉ-TOMÁS, | ) | |
| | ) | **FILED** |
| Petitioner, | ) | Jul 31, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE BOARD OF |
| WILLIAM P. BARR, Attorney General, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |

BEFORE: BOGGS, SUTTON, and WHITE, Circuit Judges

HELENE N. WHITE, Circuit Judge. Petitioner Candelaria José-Tomás seeks review of a final order of the Board of Immigration Appeals (BIA) affirming the decision of the Immigration Judge (IJ) denying her request for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Because the conclusions of the IJ and BIA were supported by substantial evidence, we deny José-Tomás's petition for review.

### I. Background

José-Tomás is a citizen and native of Guatemala. She is a member of the Acatec people and prefers to speak Acateco, a Mayan language most common in the Huehuetenango Department of Guatemala. According to her Notice to Appear (NTA), José-Tomás "arrived in the United States at or near Hidalgo, Texas, on or about June 27, 2014" without being admitted or paroled. A.R. 387. She entered the United States at the age of seventeen as an unaccompanied minor.

At a hearing on July 16, 2015, the IJ "sustain[ed] the charge under Section 212(a)(6)(A)(i) of the Act, based on the fact that she's admitted she's a native and citizen of Guatemala." A.R. 170. Because José-Tomás had filed an application for asylum, which was still pending before the United States Citizenship and Immigration Services (USCIS), the IJ rescheduled the proceedings. José-Tomás subsequently filed a motion, which the IJ granted, to administratively close her proceedings pending adjudication of her asylum application. On March 28, 2017, USCIS issued its decision that José-Tomás was ineligible for asylum. The Department of Homeland Security then filed a motion to recalendar proceedings and the IJ scheduled a hearing on the merits for March 12, 2018.

At the hearing, counsel identified José-Tomás's particular social group as "single indigenous Guatemalan females." A.R. 178. José-Tomás testified that she lives with her mother in Cookeville, Tennessee, and that she has three brothers, one sister, an uncle, and aunts in the United States. Her grandparents and an aunt remain in Chimba, Guatemala. At the time of the hearing, Jose-Tomas was pregnant and expected to give birth the following month.

When asked about harm experienced in Guatemala, José-Tomás explained that she was sexually assaulted: "I was 12 years old when individuals came and then mistreat me. . . . They, they approach me and then they, they were touching me, they were touching my parts and then they also touched one of my friends." A.R. 182. She testified that the incident "happened close to a church on December 24, 2009" and that she was "at church for Christmas service. . . . [w]ith [her] aunt." A.R. 183. The individuals who assaulted her "were waiting near like the church, not inside the church." *Id.* She had a nosebleed and went outside with her friend: "I went outside to clean my bloody nose and then they were chasing us and then they were harassing us." A.R. 184-85. She testified that the attackers were ten men "[a]round 17 or 19 years old." A.R. 185. She

had never met or seen them before and did not know if they were members of a gang. The group surrounded the girls, would not let them leave, and started "touching all parts" of their bodies. A.R. 186-88. José-Tomás screamed loudly but no one heard her. The assault went on for fifteen minutes and only stopped when "there was a man coming close, close to the scene and then when they figure out that there was a man coming, then they run away." A.R. 189. José-Tomás testified that this man was "[o]ne individual who read the Bible at the church" and that when he saw José-Tomás and her friend being attacked, he "told them let the girls, leave the girls and then they run away." A.R. 190. Thereafter, she never saw any of the individuals who attacked her and was never harmed or threatened again.

José-Tomás testified that her grandmother and sister were also harmed in Guatemala. When José-Tomás was around fifteen years old, her grandmother "was attacked, she was beaten up during" a Day of the Dead celebration. A.R. 193-94. "She was attacked by two men and she have broken bones." A.R. 194. Her grandmother reported the incident to the authorities, "a restriction order" was issued, and she was never harmed by the men again. A.R. 201. José-Tomás's younger sister "was sexually assaulted by a man" in Guatemala "[w]hen she was 11 years old." A.R. 195. Her sister never told the police about the incident because "she was also afraid or maybe she was threatened by those criminals." A.R. 196-97.

José-Tomás testified that she fears further harm:

MS. JOSE-TOMAS TO MR. HAMADEH
I'm afraid from those individuals who attacked me on that incident and then I'm also afraid from the, the criminal organization, there are a lot of criminal organization who kidnap and who rape women.
MR. HAMADEH TO MS. JOSE-TOMAS
Okay. Are you afraid that you will be harmed if you are returned?
MS. JOSE-TOMAS TO MR. HAMADEH
Yes.
MR. HAMADEH TO MS. JOSE-TOMAS
Okay. And what kind of harm do you fear?

> MS. JOSE-TOMAS TO MR. HAMADEH
> I could be kidnapped or I would be exposed to be raped again because there are a lot of criminal activities going on in my town at this time.
> MR. HAMADEH TO MS. JOSE-TOMAS
> Do you fear being, that you will be tortured if you are returned to Guatemala?
> MS. JOSE-TOMAS TO MR. HAMADEH
> Yes.
> MR. HAMADEH TO MS. JOSE-TOMAS
> And who do you fear will torture you if you go back?
> MS. JOSE-TOMAS TO MR. HAMADEH
> I have fear from the criminal organization, people who kidnap, people who use drug, they usually come in from outside of the town.

A.R. 197-98. Although the assault occurred in 2009, she came to the United States in 2014 "[b]ecause [her] mother didn't have money to pay for [her] trip." A.R. 198. Eventually, "[her] grandmother helped [her] to pay [her] expenses and [her] trip to get to the United States." *Id.*

José-Tomás testified that she could not go to the police in Guatemala for protection: "Actually there is no protection coming from the government in my area. If criminals are being detained they normally are being released right away." A.R. 199. If removed to Guatemala, she would live with her grandmother because "that is the only place where [she has] family members." A.R. 199-200. When asked if she could move to a different part of Guatemala, she responded, "Actually general crime it's happening in my country. If I would go to the main city, the main city of the department I would be exposed to suffer these crimes also." A.R. 200.

In addition to her testimony, José-Tomás submitted the U.S. Department of State's 2013 Human Rights Report for Guatemala, a Congressional Research Service report on Central American gangs, as well as several news articles describing violence against women in Guatemala and Central America.

## II. Analysis

### A. Standard of Review

"Where . . . the BIA reviewed the IJ's decision de novo and issued its own separate opinion, we review the BIA's opinion as the final agency determination." *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020) (quoting *Hassan v. Holder*, 604 F.3d 915, 924 (6th Cir. 2010). To the extent the BIA adopted the IJ's reasoning, we also review the IJ's decision. *Id.* "This Court reviews both the immigration judge's and the BIA's factual findings under the substantial-evidence standard." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "The substantial-evidence standard requires us to defer to the agency's findings of fact 'if supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012) (quoting *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 388 (6th Cir. 1998)).

### B. Asylum and Withholding of Removal

An asylum applicant "must establish that she meets the definition of a 'refugee,' which means a person who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)(A)). Similarly, "[a]n otherwise removable alien may petition for withholding of removal by showing a clear probability that, following the pending removal, the alien's 'life or freedom would be threatened' on a protected ground." *Goswami v. Holder*, 598 F. App'x 430, 431 (6th Cir. 2015) (quoting 8 U.S.C. § 1231(b)(3)(A)).

Under both standards, if the claim is based on the conduct of non-governmental actors, the petitioner must demonstrate that the persecutors are "either aligned with the government or that the government is unwilling or unable to control" them. *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020); *see also Khalili*, 557 F.3d at 436. "An applicant meets this burden when she shows that she cannot 'reasonably expect the assistance of the government' in controlling her perpetrator's actions." *Juan Antonio*, 959 F.3d at 793 (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009). "[W]e look to two general categories of information: (1) the government's response to an asylum applicant's persecution and (2) general evidence of country conditions." *K. H. v. Barr*, 920 F.3d 470, 476 (6th Cir. 2019).

José-Tomás asserts that "[t]he IJ and BIA erred in finding that the government of Guatemala is not unable or unwilling to control the violence against women in Guatemala." Pet'r Br. at 50. The IJ held that José-Tomás did "not establish that there is any government factor involved and respondent has indicated plainly in her testimony that she is not afraid of the government but is rather afraid of third party individuals." A.R. 98. The IJ also noted that "as evidenced by the incident with the respondent's grandmother, there are apparently authorities in the town who are willing to get involved and at least issue restraining orders . . . ." A.R. 99. Further, the IJ found that the Guatemalan "government has engaged in an all out effort to assist individuals who have been subjected to criminal and gang activities and violence":

> The most recent [Human Rights Report] also specifically establishes a number of organizations that have been established within the Guatemalan government to assist, particularly indigenous women with problems concerning their ethnicity and their gender. There has been an increase in prosecutions both of individuals who have been previously treating women with impunity, but also prosecutions of corrupt police officials as well. The most recent report also acknowledges that there have been a number of police units that have been specifically trained, both on gender and indigenous issues, and that the police are being prosecuted for corrupt practices. There are a number of women's shelters that have been established to

6

assist women who have the problems argued by her attorney that are historical against women, both generally and because of their indigenous nature.

A.R. 99-100. The BIA agreed:

The respondent does not claim that she was or will be harmed by the government. She did not report the incident to the police and testified that she did not do so because of the lack of police presence. However, her grandmother's incident shows that some authorities in her town were willing to become involved and provide assistance, including by issuing a restraining order. The respondent has therefore not shown that her seeking police protection would have been futile.

A.R. 10 (citations omitted).

José-Tomás argues that the evidence demonstrates that "the government of Guatemala has failed miserably at containing or even reducing the violence against women." Pet'r Br. at 50. We acknowledge, as did the BIA, that "the record contains evidence of criminal activity and violence against women." A.R. 10. But under the substantial-evidence standard, "we will not reverse a factual determination . . . unless we find 'that the evidence not only supports a contrary conclusion, but *compels* it.'" *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)). As the BIA explained, the IJ's decision was supported by the record: "[T]he Human Rights Report shows that Guatemalan law . . . provides for restraining orders against perpetrators and the government provides services to victims of violence. The government has also made efforts to assist indigenous women and members of the indigenous community generally." A.R. 10 (citations omitted).

The BIA concluded "that the respondent did not meet her burden to show that the Guatemalan government was or will be unable or unwilling to protect her from the private actor she fears." *Id.* José-Tomás points to evidence in the record supporting the opposite conclusion and challenges how the agency weighed the evidence. She cites the Human Rights Report and argues that "[v]iolence against women is rampant in Guatemala and law enforcement are not

equipped or trained to fight this epidemic." Pet'r Br. at 61. But as the IJ and BIA explained, the record also demonstrates that the government of Guatemala is taking steps to protect indigenous women from violence. And "[w]e cannot reverse such findings simply because we would have decided them differently." *K. H.*, 920 F.3d at 475. The IJ and BIA properly relied on José-Tomás's testimony as well as the reports and articles that she submitted. Taken as a whole, the record adequately supports the agency's finding.[1]

### C. Convention Against Torture

To qualify for protection under the CAT, a petitioner must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture includes:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on

---

[1] Before the IJ, counsel identified José-Tomás's particular social group as "single indigenous Guatemalan females." A.R. 178. In her brief to this court, as in her brief to the BIA, José-Tomás argues that the social group presented to the IJ was "an oversimplification" and "[t]he particular social group which should have been declared to the court would be indigenous Acateco females without protection from the police or local society." A.R. 27; Pet'r Br. at 18. The BIA concluded that by failing to present this argument to the IJ, José-Tomás waived the argument on appeal: "The clause 'without protection from the police or local society' renders it a new social group. Because the respondent did not proffer this social group to the Immigration Judge, she was unable to provide factual findings regarding whether it is cognizable." A.R. 7-8. José-Tomás argues that she "is not introducing a new social group on appeal; she has simply developed and clarified the delineation of the social group." Pet'r Br. at 20. And, she argues, "[t]he IJ and BIA failed to recognize that the things that happened to [her] occurred because she is an indigenous Acateco." *Id.* at 31. The Attorney General responds that "the issue is not properly before the Court because the Board deemed the issue waived and did not address it." Resp't Br. at 4 n.1.

José-Tomás also challenges the BIA's holding in *Matter of W-Y-C- & H-O-B-*, which requires that "[w]here an applicant raises membership in a particular social group as the enumerated ground that is the basis of her claim, she has the burden to clearly indicate 'the exact delineation of any particular social group(s) to which she claims to belong.'" 27 I. & N. Dec. 189, 191 (BIA 2018) (quoting *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009)). José-Tomás argues that the "exact delineation" requirement "is at odds with the concept of a legally just adjudication based on factual findings." Pet'r Br. at 22.

Because we affirm on other grounds, we need not resolve these issues. Similarly, we do not address José-Tomás's arguments that the IJ and BIA erred in finding that she did not suffer past persecution or have a well-founded fear of future persecution based on a protected ground and that she lacked corroboration for her claim. Whatever the merits of José-Tomás's arguments, the conclusion that she failed to show that the Guatemalan government was unwilling or unable to control her persecutors is dispositive. *See K. H. v. Barr*, 920 F.3d 470, 473 (6th Cir. 2019).

discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Kamar v. Sessions*, 875 F.3d 811, 820 (6th Cir. 2017) (quoting *Singh v. Ashcroft*, 398 F.3d 396, 404-05 (6th Cir. 2005)).

José-Tomás argues that "[g]iven the increasing prevalence of violence against women in Guatemala, it is clearly established that [she] will more likely than not be subjected to physical or mental pain or suffering if removed to Guatemala." Pet'r Br. at 63-64. However, an applicant for relief under the CAT "must establish a *particularized* threat of torture." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010) (quoting *Almuhtaseb v. Gonzale*s, 453 F.3d 743, 751 (6th Cir. 2006)). The IJ found that "the respondent describes no fear of being tortured by police or any government official, but rather she fears some unnamed generalized criminal actors in her country." A.R. 102. The IJ concluded that José-Tomás failed to "establish that the government would acquiesce to any torture with advanced notice, and her application for Torture Convention relief must also be denied." *Id.* Similarly, the BIA concluded:

> We also affirm the denial of the respondent's application for protection from removal under the Convention Against Torture. The respondent has not presented sufficient evidence to show that any public official would consent or acquiesce to torture against her. The respondent does not claim that she was or will be harmed by a public official or an individual acting in an official capacity. She did not report the incident to the authorities, although the record contains evidence that some help or protection is available to her. We acknowledge the general country conditions, including violence against women, in Guatemala, but this evidence does not indicate that the respondent faces an individualized risk of harm if she returns to that country.

A.R. 11 (citations omitted).

José-Tomás again cites contrary evidence in the record and challenges how the agency weighed the evidence. José-Tomás points, for instance, to the Human Rights Report, which states, "Although the constitution and the law [of Guatemala] prohibit torture and other cruel, inhuman,

9

or degrading treatment or punishment, there were credible reports of abuse and other mistreatment by [National Civil Police] members." A.R. 260. The report also states, with respect to women, "[a]ccording to the Public Ministry, there were 2,156 cases of sexual or physical assault reported through" the first nine months of the year. A.R. 276. While these facts are disturbing, under the substantial-evidence standard, the agency's "findings are conclusive 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Kamar v. Sessions*, 875 F.3d 811, 817 (6th Cir. 2017) (quoting *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006). The IJ and BIA reviewed the evidence cited by José-Tomás and "properly considered 'all evidence relevant to the possibility of future torture.'" *Mostafa v. Ashcroft*, 395 F.3d 622, 626 (6th Cir. 2005) (quoting 8 C.F.R. § 208.16(c)(3)). That evidence does not compel the conclusion "that it is more likely than not that . . . she would be tortured if removed to" Guatemala. 8 C.F.R. § 1208.16(c)(2).

The BIA concluded "that the respondent has not met her burden of showing that it is more likely than not that she would be tortured in Guatemala by, or with the consent or acquiescence (to include the concept of willful blindness) of a public official or an individual acting in an official capacity." A.R. 11. "Because this determination is supported by substantial evidence, and no reasonable adjudicator would be compelled to come to a contrary determination, the record does not compel reversal of the BIA's decision."[2] *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 296 (6th Cir. 2016).

### III. Conclusion

Based on the foregoing, we deny José-Tomás's petition for review.

---

[2] José-Tomás also argues that "because a defect in the removal proceedings occurred, and because [she] was most certainly prejudiced due to that defect, the IJ violated her Fifth Amendment right to due process." Pet'r Br. at 68-69. She argues that "the IJ and BIA's findings indicate that they failed to take into account all factors present." *Id.* at 68. As noted, the agency reviewed and cited to all relevant evidence. Therefore, we find no "defect in the removal proceeding." *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005).