RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARIA MAGDALENA JUAN ANTONIO,

*Petitioner*,

*v.*

WILLIAM P. BARR, Attorney General,

*Respondent*.

No. 18-3500

On Petition for Review from the Board of Immigration Appeals;
No. A 206 468 574.

Decided and Filed:  May 19, 2020

Before:  COLE, Chief Judge; BOGGS and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Margaret Wong, MARGARET WONG & ASSOCIATES LLC, Cleveland, Ohio, for Petitioner.  Genevieve M. Kelly, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GIBBONS, J. delivered the opinion of the court in which COLE, C.J., joined.  BOGGS, J. (pp. 24–25), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  Maria Magdalena Juan Antonio,[1] a native and citizen of Guatemala, appeals from the Board of Immigration Appeals' (the "Board") denial of her application for asylum and withholding of removal.  In its denial, the Board found that Maria articulated a cognizable particular social group and that the harm she suffered rose to the level of past persecution.  It then concluded, however, that the government effectively rebutted her well-founded fear of future persecution by showing changed circumstances: that she was no longer part of her articulated social group and that she could reasonably relocate within Guatemala.  On appeal, Maria argues that the Board's conclusion was not supported by substantial evidence on the record as a whole.  We agree with Maria.  Therefore, we grant the petition for review, vacate the Board's decision, and remand for reconsideration consistent with this opinion.

I.

Maria is a 33-year-old native and citizen of Guatemala.  She was born in Aldea Village in Quetzal Huehuetenango.  She is a member of a Mayan indigenous group in Guatemala.  Her native language is Kanjobal and she wears clothing distinct to Mayans.  She never attended school and cannot read or write.  Maria currently lives in Nashville, Tennessee, where she works at a hotel.

Maria is married to Juan Cano Lorenzo, who is also Mayan and currently resides in Guatemala.  They have been married for eighteen years.  They have four children together—the older two were born in Guatemala and the younger two were born in the United States.  Their children, Sophia, Huberto, Maura, and Maria Floridalma, are ages seven, twelve, sixteen, and eighteen, respectively.  Huberto is autistic and cannot speak.  Sophia and Huberto reside with Maria in Nashville.

---

[1]For the sake of clarity, we refer to Maria Magdalena Juan Antonio and Juan Cano Lorenzo by their first names.

Maria's application for asylum and withholding of removal stems from domestic violence suffered at the hands of her husband. This abuse arose within the broader context of systemic violence, harassment, and subordination of indigenous Mayan women in Guatemala. The larger societal context will be discussed below.

Six months after Maria and Juan were married, Juan began to physically abuse her. Juan would take Maria to the fields to plant crops with him, even while she was pregnant. At times when she could not work or needed to take a break, he would kick and hit her. He also began raping her, as often as four or five times in one night. The rape has continued throughout the course of their marriage.

In April 2005, Juan took Maria to the United States with him. They left their two children with Maria's mother in Guatemala. They resided in Detroit, Michigan, where Maria worked at a plate factory and Juan worked at a "card fabric" [sic] company. While in Detroit, Juan continued to beat and rape Maria. Claiming he was "the one in charge," he also took Maria's paychecks from the plate factory, giving her only five dollars a week "to buy a soda at work or something like that." AR 167, Immigration Ct. Tr. On several occasions, he told her "that he would kill [her]" and that "[i]f [she] call[ed] the police, [he would] kill [her] and throw [her] body out in the trash so that no one will ever find [her]." AR 332, I-589 Appl. Maria did not report Juan's abuse to the police because she feared that the police would report her to immigration officials. Their two younger children, Huberto and Sophia, were born in Detroit in 2006 and 2011. Sophia was born out of rape. Huberto, who is autistic, is nonverbal and "needs to be watched . . . all the time." AR 170, Immigration Ct. Tr.

In April 2012, Juan forced Maria and their children to move back to Guatemala with him. Upon moving, Juan "cleared out [their] bank account and sent all the money [Maria] had earned to his father." AR 332, I-589 Appl. For the first two months back, they, along with all four children, lived with Maria's parents. During this two-month period, Juan did not beat or rape Maria. As soon as they moved out of her parents' home, however, the abuse resumed. Juan "became violent again, beating [her] nearly every day." *Id.* In April 2013, Juan tried to rape their oldest daughter, Maria Floridalma. When Maria intervened to stop him, he threw a chair at her and told her that "he would kill [her] if [she] did not leave." *Id.* Maria and her brother called

the police for help, but the police never came. This was one of two occasions in which the police did not respond to Maria's calls regarding Juan.

In April 2013, Maria and her brother succeeded in getting Juan to move out of the house. Juan moved in with another woman, Lucia, about three or four blocks down the street, and Maria obtained a restraining order against Juan. But Juan "did not obey because there [was] no police" and "[h]e wasn't afraid" of any consequences. AR 180, Immigration Ct. Tr. At some time that year, Juan came to Maria's home and beat up their oldest child, whipping her with his belt. Maria went to the police station to file a complaint, but the police never investigated the crime. AR 332, I-589 Appl. As a consequence of violating the restraining order, however, the town's mayor summoned Juan to court and a judge imposed a fine of about $200. Since then, the courthouse has been destroyed and the judge who imposed the fine has left town.

Throughout the course of the year, Juan did not physically harm Maria but continued to threaten that he would kill her. Maria testified that "he threatened that he was going to kill me, and if not[,] that he would pay someone to do something." AR 188, Immigration Ct. Tr. Juan's girlfriend also "began threatening [Maria] about once a week, yelling at [her] . . . that she and Juan would kill [her] if [she] didn't move out of the house." AR 332, I-589 Appl. In May 2014, Juan's sister told Maria that "Juan had bought a gun and planned to kill [Maria]." *Id.* at 333.

Terrified, Maria left Guatemala in June 2014 with her two youngest children. They entered the United States through Texas. Upon crossing, they were detained by border patrol agents for three days and then released to live in Aberdeen, Texas with Maria's friend and his son. On October 31, 2014, the Department of Homeland Security ("DHS") issued a Notice to Appear.

Since their 2014 return, Maria and her two youngest children have not left the United States. Maria has learned from her father, who contacted a local judge, that "Juan has submitted a petition to try to locate [her] and order [her] to return to Guatemala." *Id.* at 326. She believes that "he wants [her] to return to Guatemala so that he can kill [her]." *Id.* Since re-entering the United States, Maria has initiated divorce proceedings against Juan, but they have proved

unsuccessful so far.  Juan will not agree to a divorce unless Maria cedes custody of her children to him.  Maria is unwilling to do so.

In June 2015, Maria filed an application for asylum, withholding of removal, and protection under the Convention Against Torture.  She sought protection as part of the particular social group of "married indigenous women in Guatemala who are unable to leave their relationship."  AR 65, Immigration Ct. Order.  Maria "fear[s] being tortured by [her] husband if he finds [her]."  AR 327, I-589 Appl.  He "has told [her] that he has friends who are gang members, and [she] also fear[s] being tortured by them," as the gangs in Guatemala, such as the Mara Salvatrucha, "are known for torturing people."  *Id.*  Maria's fears are exacerbated because she does not believe the police will help her based on her indigenous status.  She has explained that "Mayans are treated as second-class citizens because [their] native language is not Spanish and [they] wear traditional clothing" and that she "believe[s] the police will not take [her] case seriously because [she] is indigenous."  *Id.* at 326.

In her application, Maria submitted secondary materials to corroborate her description of the conditions in Guatemala.  All supplemental evidence was admitted into the record without objection.  The included materials explain that gender-based violence "perpetrated by husbands, boyfriends, male relatives, bosses, and strangers" is at "epidemic levels," and that this is especially true for indigenous Mayan groups.  AR 274–75, Guatemala Struggles to Protect Women Against Endemic Violence.  One article noted that "[w]hile the armed conflict which ravaged the country officially ended almost ten years ago, the violence against indigenous women has continued at an alarmingly high rate" and that this often comes in the form of "domestic violence against Guatemala women."  AR 444–45, From War to Home: An Examination of the Violence Perpetrated Against Indigenous Women in Guatemala and the Remedies Indigenous Women Demand.  As a result of this distinct brand of violence, Guatemala became the first country to officially recognize femicide—the murder of women because of their gender—as a crime.  In 2015, the BBC reported that Guatemala has the third highest femicide rate in the world which stems from "a culture of violence toward women and an expectation of impunity, which still persists today."  AR 280, Where Women Are Killed by Their Own Families.

While the government has taken some steps to combat this violence—for example, the law now criminalizes domestic abuse—conditions are still stark. The United Nations Refugee Agency has reported that "the systemic marginalization of indigenous communities . . . continues with no meaningful efforts by the government to overcome it." AR 285, State of the World's Minorities and Indigenous Peoples 2015—Guatemala. In 2016, the United States Bureau of Democracy, Human Rights and Labor reported that the "[p]olice [have] minimal training or capacity to investigate sexual crimes or assist survivors of such crimes" and that the "government [does] not enforce the law effectively." AR 255, Country Reports on Human Rights Practices for 2016. The Bureau further reported that "impunity for perpetrators remain[s] very high." *Id.* For Mayan indigenous women, there is "increased vulnerability and gender-based violence . . . exacerbated by a weak state apparatus that struggles to implement laws and programming to protect these groups." AR 274, Guatemala Struggles to Protect Women Against Endemic Violence.

Mayan women cannot secure government protection from this violence partly because they often do not have access to legal remedies. Aside from being generally disadvantaged by systemic marginalization and subordination, indigenous Mayan women face additional hurdles: they are often too far from courthouses and speak a native language different from the authorities. One researcher reported that "a large barrier . . . is placed between indigenous women and their access to justice when court officials refuse their right to speak in their native tongue." AR 449–50, From War to Home: An Examination of the Violence Perpetrated Against Indigenous Women in Guatemala and the Remedies Indigenous Women Demand. Of the 11,399 reports of sexual or physical assault reported by women in Guatemala in 2016, only .05% resulted in convictions. It stands to reason that that percentage would be even lower for indigenous Mayan women.

In May 2017, an immigration judge in Memphis, Tennessee, Richard Averwater, considered Maria's application for asylum, withholding of removal, and protection under the Convention Against Torture. He made a threshold determination that Maria was credible. Judge Averwater found that Maria's "courtroom testimony was consistent with the corroborating evidence which she provided," that her demeanor was "good," and that her narrative was

"plausible and believable." AR 64–65, Immigration Ct. Order. He determined that the court would "therefore adopt the testimony of the respondent as its factual findings." *Id.* at 65.

Judge Averwater further found that "married indigenous women in Guatemala who are unable to leave their relationship" constituted a cognizable particular social group, and that he had "no trouble finding that the harm this respondent suffered would rise to the level of persecution" on account of her membership in that group. AR 69–70, Immigration Ct. Order. He found that Maria was therefore entitled to a presumption of future persecution. He then decided, however, that changed circumstances defeated that presumption of a well-founded fear of future persecution in Guatemala: she physically left the relationship with Juan and was therefore no longer part of the articulated particular social group, had not been physically harmed by him during her last year in Guatemala, and could reasonably relocate to another location in Guatemala. Upon denying her application for asylum, withholding of removal, and protection under the Convention Against Torture, however, Judge Averwater reiterated that "[h]ad there not been changed circumstances, the [c]ourt would quickly grant this respondent asylum." *Id.* at 72.

In May 2018, the Board affirmed the denial. Although the Board found that Maria had articulated a cognizable particular social group and that "the level of mistreatment she endured would constitute persecution," AR 4, Board of Immigration Appeals, it ultimately agreed with the immigration court that Maria's ability to live separately from her husband for a year in Guatemala indicated that she was no longer part of the articulated group and that she could reasonably relocate within Guatemala. The Board also found that the immigration judge did not clearly err in finding that the Guatemalan government was able and willing to control Juan. The Board therefore denied asylum and withholding of removal. In denying asylum, the Board also concluded that Maria's argument for humanitarian asylum was waived because she did not raise it separately before the immigration judge. Maria timely petitioned this court for review of the Board's decision in its entirety.

## II.

This court has jurisdiction under 8 U.S.C. § 1252 to review the Board's final determination ordering removal. *Harmon v. Holder*, 758 F.3d 728, 732 (6th Cir. 2014). Where,

as here, the Board issues its own decision, we review the Board's decision as the "final agency determination" but also review the immigration judge's decision to the extent that the Board adopted it. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review questions of law *de novo* but give "substantial deference to the [Board]'s interpretations of the INA and its accompanying regulations." *Kukalo v. Holder*, 744 F.3d 395, 399 (6th Cir. 2011) (citing *Khalili*, 557 F.3d at 435). We review factual findings under the substantial evidence standard. *Id.* Under the substantial evidence standard, "we uphold a [Board] determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009) (quoting *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008)). Reversal is warranted only when "the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014) (quoting *Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004)).

## III.

On appeal, Maria argues that the Board's decision denying asylum and withholding of removal was not supported by substantial evidence. First, she argues that the Board incorrectly concluded that she was no longer a member of her articulated particular social group: married indigenous women in Guatemala unable to leave their relationships. Second, she argues that the Board wrongly determined that the Guatemalan authorities are willing and able to control Juan. Third, she contends that the Board erred in finding that she could reasonably relocate within Guatemala. Last, she asserts that she is eligible for withholding of removal on the same grounds, and that she did not waive the humanitarian asylum claim and that this court should consider it on the merits.

We agree that the Board's denial of asylum was not supported by substantial evidence on the record as a whole. We therefore grant the petition for review, vacate the Board's decision, and remand for further proceedings consistent with this opinion. Accordingly, we also find that on remand the Board should further consider Maria's argument for humanitarian asylum and her application for withholding of removal.

A.

Applicants who meet the definition of a "refugee" are eligible for asylum under the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158; *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). The asylum applicant bears the burden of showing that he is a refugee. *Gilaj*, 408 F.3d at 283. A refugee is someone "who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)). A "particular social group" is a group that shares a "common, immutable . . . [and] fundamental characteristic that either cannot be changed or should not be required to be changed because it is fundamental to the members' individual identities or consciences." *Khozhaynova v. Holder*, 641 F.3d 187, 195 (6th Cir. 2011) (quoting *Lugovyj v. Holder*, 353 F. App'x 8, 10 (6th Cir. 2009)).

The Board has defined persecution as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Khalili*, 557 F.3d at 436 (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)). "An applicant who establishes that she has suffered past persecution is presumed to have a well-founded fear of future persecution." *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010). The government can rebut this presumption, however, by showing that conditions in the country "have changed so fundamentally that the applicant no longer has a well-founded fear of future persecution." *Id.*

"Alternatively, an applicant can demonstrate a well-founded fear of future persecution by showing that she has a genuine fear and that a reasonable person in her circumstances would fear persecution on account of a statutorily-protected ground if she returned to her native country." *Kante v. Holder*, 634 F.3d 321, 325 (6th Cir. 2011). To succeed, "[t]he applicant must present evidence establishing an 'objective situation' under which her fear can be deemed reasonable." *Id.* (quoting *Perkovic v. INS*, 33 F.3d 615, 620–21 (6th Cir. 1994)).

1.

Maria seeks asylum and withholding of removal on the basis of membership in the particular social group of "married (indigenous) women in Guatemala who are unable to leave their relationships." AR 3, BIA Decision.  Both the immigration judge and Board found that this was a cognizable particular social group under the INA but that Maria no longer belonged to the group due to a "fundamental change in circumstances."[2]  Maria contends that the Board's decision was not supported by substantial evidence, as she is still a Mayan indigenous woman and remains married to Juan, who will not agree to a divorce unless she cedes custody of her children.

The INA does not define "particular social group," but the Board and this court have articulated its requirements.  The group's shared characteristic "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Bi Xia Qu*, 618 F.3d at 606 (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)).  In addition, "a social group may not be circularly defined by the fact that it suffers persecution." *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005).  Rather, "the group must share a narrowing characteristic other than their risk of being persecuted." *Id.*  Moreover, the "alleged social group must be both particular and socially visible." *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013) (quoting *Bonilla-Morales*, 607 F.3d at 1137).  Particularity requires that "the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 994 (6th Cir. 2009)).  Social visibility "requires 'that the shared characteristic of the group should generally be recognizable by others in the community.'" *Id.* (quoting *In re S-E-G-*, 24 I. & N. Dec. 579, 586 (BIA 2008)).

---

[2]The Board articulated its decision in two alternative ways.  First, it said that although this was a cognizable particular social group, "respondent has not shown she is a member of this particular social group."  AR 4, BIA Decision.  It then reframed the issue, noting that even "if she were a member, her ability to leave shows there has been a fundamental change in circumstances, such that the respondent no longer has a well-founded fear of persecution in the future." *Id.*  This opinion finds that "married indigenous women in Guatemala who are unable to leave their relationships" is both a cognizable particular social group of which Maria was a part and that she continues to be a part of this group; this analysis applies both to establishing past persecution and that there was not a fundamental change in circumstances which would rebut the presumption of future persecution.

The Board has found that "married women in Guatemala who are unable to leave their relationship" can constitute a cognizable particular social group under the INA. *Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 389 (BIA 2014).[3]  In reaching this conclusion, the Board found that "the group is composed of members who share the common immutable characteristic of gender." *Id.* at 392.  It further explained that "marital status can be an immutable characteristic where the individual is unable to leave the relationship" and that "[a] determination of this issue will be dependent upon the particular facts and evidence in a case." *Id.* at 392–93.  Whether a married woman can leave a relationship "may be informed by societal expectations about gender and subordination, as well as legal constraints regarding divorce and separation." *Id.* at 393.  The Board has provided that "[i]n evaluating such a claim, adjudicators must consider a respondent's own experiences, as well as more objective evidence, such as background country information." *Id.*

---

[3]*Matter of A-R-C-G* was overruled by *Matter of A-B*, which held that the Board in *Matter of A-R-C-G-* did not conduct a rigorous enough analysis in its determination that the particular social group was cognizable. *See Matter of A-B-*, 27 I. & N. Dec. 316, 331 (A.G. 2018) (noting that because DHS conceded that particular social group was cognizable, "the Board performed only a cursory analysis of the three factors required to establish a particular social group").  Our sister circuits have determined that this change counsels remand. *See Padilla-Maldonado v. Att'y Gen. U.S.*, 751 F. App'x 263, 268 (3d Cir. 2018) ("While the overruling of *A-R-C-G-* weakens [the applicant's] case, it does not automatically defeat her claim that she is a member of a cognizable particular social group.  As we remand to the BIA to remand to the IJ, the IJ should determine whether [the applicant's] membership in the group . . . is cognizable . . . ."); *Moncada v. Sessions*, 751 F. App'x 116, 118 (2d Cir. 2018) ("This Court, like the BIA, applies the law as it exists at the time of decision.  And, where, as here, intervening immigration decisions from the executive branch alter the applicable legal standards, we have previously exercised our discretion to remand the matter to the BIA to apply the new standards in the first instance.  Recognizing the wisdom of this practice, we take the same tack here and remand this case 'for the BIA to interpret and apply the standards set forth in [*Matter of A-B-*] in the first instance.'" (quoting *Biao Yang v. Gonzales*, 496 F.3d 268, 278 (2d Cir. 2007) (internal citations omitted)).

However, *Matter of A-B-* has since been abrogated. *See Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018).  *Grace* found that the policies articulated in *Matter of A-B-* were arbitrary, capricious, and contrary to law. *See id.* at 126–27 (holding that there is no general rule against claims involving domestic violence as a basis for membership in a particular social group and that each claim must be evaluated on an individual basis under the statutory factors).  The district court's decision in *Grace* is currently on appeal to the D.C. Circuit.  We acknowledge that we are not bound by *Grace* but find its reasoning persuasive.  Because *Matter of A-B-* has been abrogated, *Matter of A-R-C-G-* likely retains precedential value.  But, on remand, the agency should also evaluate what effect, if any, *Matter of A-R-C-G-* and *Grace* have had on the particular social group analysis. *See Bi Xia Qu*, 618 F.3d at 609 ("When the BIA does not fully consider an issue, . . . the Supreme Court has instructed that a reviewing court 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed.'  Rather, 'the proper course, except in rare circumstances, is to remand to the [BIA] for additional investigation or explanation.'" (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006))).

Here, Maria's particular social group is narrower than that articulated in *Matter of A-R-C-G-*, as it also encompasses a race-based distinction—central to Maria's claim is that she is an indigenous Mayan woman. Accordingly, both the immigration court and Board found this group cognizable. But they also both found that Maria was not part of this group. Echoing the immigration court, the Board found that "respondent was able to leave the abusive relationship and lived without serious problem, four blocks from the perpetrator, for a year and [two] months." AR 4, BIA Decision. Therefore, the Board concluded that Maria was "no longer a member of the particular social group and that this is a fundamental change in circumstances." *Id.*

The Board's conclusion is not supported by substantial evidence on the record considered as a whole. First, this court has noted that physical separation does not necessarily indicate that a relationship has ended—if it did, then any woman who escaped her persecutor and then filed an application for asylum on these grounds would be denied. *See Martinez-Martinez v. Sessions*, 743 F. App'x 629, 634 (6th Cir. 2018) ("We would not agree that every woman who is able to escape her husband thereby removes herself from the social group of women who are unable to leave their relationship . . . ."). Second, the facts in the record do not support a finding that Maria lived "without serious incident" once she and Juan no longer lived together. AR 4, BIA Decision. Rather, there were multiple "serious incidents" during that year—culminating in Maria's learning that Juan had purchased a gun and planned to kill her—that led Maria to flee from Guatemala in 2014. Juan moved out of the house in April 2013, around the same time when Maria obtained a restraining order against him. In the year that followed, Juan violated the restraining order on at least one occasion when he came to Maria's house and beat their oldest child with his belt. He also "wanted to kidnap [their] youngest child." AR 195, Immigration Ct. Tr. Maria further testified that Juan continued to threaten that "he was going to kill [her], and if not[,] that he would pay someone to do something." *Id.* at 188. During that year, Juan's girlfriend also "began threatening [Maria] about once a week, yelling at [her] . . . that she and Juan would kill [her] if [she] didn't move out of the house." AR 332, I-589 Appl. The year culminated with Maria learning from Juan's sister that "Juan had bought a gun and planned to kill [Maria]." *Id.* at 333. Maria left Guatemala a month later. Since leaving Guatemala, Maria has heard from her father that "Juan has submitted a petition to try to locate [her] and order [her]

to return to Guatemala." *Id.* at 326. Maria believes that "he wants [her] to return to Guatemala so that he can kill [her]." *Id.*

Given Maria's previous years of abuse and violence perpetrated by Juan, situated within the context of the systemic subordination of Mayan indigenous women in Guatemala, the Board's conclusion that she has lived "without serious problem" and in a "period of calm" since Juan moved out of the house is not supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Zhao*, 569 F.3d at 247 (quoting *Koulibaly*, 541 F.3d at 619). Juan violated the restraining order, beat their oldest child, repeatedly threatened to kill Maria or one of their children, and purchased a gun with the intent to kill her. That Maria conceivably lived "without serious problem" in light of this pervasive abuse and fear is not supported by substantial evidence on the record. Thus, the record "not only supports a contrary conclusion, but indeed *compels* it." *Mandebvu*, 755 F.3d at 424 (quoting *Yu*, 364 F.3d at 702–03).

Similarly, the Board's conclusion that Maria is no longer part of the particular social group because she has filed for divorce is not based on substantial evidence on the record. The Board is correct that Maria initiated divorce proceedings in 2016. But the proceedings have been entirely unsuccessful; Maria and Juan remain married. The Board has said that whether a married woman can leave a relationship "may be informed by societal expectations about gender and subordination, as well as legal constraints regarding divorce and separation." *Matter of A-R-C-G-*, 26 I. & N. Dec. at 393. "In evaluating such a claim, adjudicators must consider a respondent's own experiences, as well as more objective evidence, such as background country information." *Id.* Here, the record compels a conclusion that Maria cannot actually leave the marriage—Juan has stated that he will only agree to the divorce if Maria gives up custody of their children. Maria has stated that she will never give Juan custody over their children. Background country information corroborates Maria's account of her experiences: in Guatemala, Mayan women have little social capital. *See Matter of A-R-C-G-*, 26 I. & N. Dec. at 393–94. Under these circumstances, the Board's conclusion that Maria can leave the marriage by ceding custody of her children to the man who has repeatedly beaten and raped her, as well as beaten

and attempted to rape one of their children, is unreasonable and not supported by substantial evidence.

Thus, the Board's finding that Maria is no longer part of the particular social group of "married indigenous women in Guatemala who are unable to leave their relationship" is not supported by substantial evidence on the record. The concurrence would have us further narrow this social group by relying on only one factor to determine whether a woman was able to leave her relationship. However, because a woman's ability to leave a relationship is an inherently a complex, fact-bound question which requires courts to assess various facts, such as her ability to gain physical or legal separation, we decline the concurrence's request to only allow one approach. Here, the "record considered as a whole," which includes both Maria's testimony and the broader societal context of indigenous Mayan women in Guatemala, "not only supports a contrary conclusion, but indeed *compels* it." *Mandebvu*, 755 F.3d at 424 (quoting *Yu*, 364 F.3d at 702–03). Maria remains married, she remains indigenous Mayan, and she remains unable to leave her relationship. We therefore vacate the Board's finding that Maria no longer belongs to the articulated particular social group, and remand so the agency can reconsider her application consistent with this opinion.

2.

Agreeing with the immigration court, the Board found that "the level of mistreatment [Maria] endured would constitute persecution." AR 4, BIA Decision; AR 70, Immigration Ct. Order ("The court has no trouble finding that the harm this respondent suffered would rise to the level of persecution."). Later in its decision, however, the Board changed gears and found that Maria "did not meet her burden to establish that her claimed harm constitutes 'persecution' under the Act" because she did not show that the Guatemalan government was unable or unwilling to control Juan. AR 5, BIA Decision. Maria argues that the Board's finding was not supported by substantial evidence.

The INA does not define "persecution." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). But this court has determined that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment,

infliction of harm, or significant deprivation of liberty." *Id.* at 390. It is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Japarkulova v. Holder*, 615 F.3d 696, 699 (6th Cir. 2010) (quoting *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004)). While "physical abuse is not an absolute prerequisite to a finding of persecution," threats alone are only sufficient when they are "of a most immediate and menacing nature." *Id.* at 700–01 (quoting *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997)). This court's determination of whether conduct amounts to "persecution does not necessarily turn on the severity of the conduct itself or on the frequency of the alleged incidents." *Gilaj*, 408 F.3d at 285. "Rather, the critical factor is the overall context in which the harmful conduct occurred." *Id.* "An applicant must show that she was 'specifically targeted' and was not 'merely a victim of indiscriminate mistreatment.'" *Haider v. Holder*, 595 F.3d 276, 287 (6th Cir. 2010) (quoting *Gilaj*, 408 F.3d at 285).

When an asylum claim focuses on non-governmental conduct, the applicant must show that the alleged persecutor is either aligned with the government or that the government is unwilling or unable to control him. *See Khalili*, 557 F.3d at 436. An applicant meets this burden when she shows that she cannot "reasonably expect the assistance of the government" in controlling her perpetrator's actions. *Al-Ghorbani*, 585 F.3d at 998. For example, in *In re S-A*, the Board found that an applicant was eligible for asylum when she suffered domestic abuse at the hands of her father. *In re S-A-*, 22 I. & N. Dec. 1328 (BIA 2000). Relying on evidence showing that "in Morocco, domestic violence is commonplace and legal remedies are generally unavailable to women," and that "'few women report abuse to authorities' because the judicial procedure is skewed against them," the Board held that "even if the respondent had turned to the government for help, Moroccan authorities would have been unable or unwilling to control her father's conduct." *Id.* at 1333, 1335 (quoting Committees on International Relations and Foreign Relations, 105th Cong., 2d Sess., Country Reports on Human Rights Practices for 1997 1538 (Joint Comm. Print 1998)).

Here, both the immigration judge and Board agreed that the beatings, rape, and threats Maria suffered were severe enough to constitute persecution, but that she failed to show that the Guatemalan government was unwilling or unable to control Juan. In support of its conclusion,

the Board noted that the government issued a restraining order against Juan, the mayor fined Juan for beating their daughter, and that Maria and their children were able to remain in their home for the year before she left Guatemala. AR 5, BIA Decision. Maria argues on appeal that the Board's decision was not supported by substantial evidence on the record as a whole. We agree with her.

Taken as a whole, the record compels the conclusion that Maria cannot "reasonably expect the assistance of the government" in controlling Juan. *Al-Ghorbani*, 585 F.3d at 998. First, the Board's conclusion that the restraining order effectively controlled Juan is clearly contradicted by the evidence. Maria testified that Juan "did not obey [the restraining order] because there [was] no police" and "[h]e wasn't afraid" of any consequences, AR 180, Immigration Ct. Tr., and that at some time that year, Juan came to Maria's home and beat their oldest child with his belt. She further testified that she went to the police station to file a complaint, but the police never investigated the crime. Second, the Board's conclusion that "the respondent and her children were able to live legally in the family house" for a year does not paint an accurate picture of that year. AR 5, BIA Decision. The year was not a "period of calm," as the Board characterized it, but rather, a year which affirmed that the Guatemalan government had not effectively gained control over Juan. *Id* at 5 n.2. Throughout the course of the year, Maria received threats that Juan "was going to kill [her], and if not[,] that he would pay someone to do something." AR 188, Immigration Ct. Tr. Juan's girlfriend also "began threatening [Maria] about once a week, yelling at [her] . . . that she and Juan would kill [her] if [she] didn't move out of the house." AR 332, I-589 Appl. In May 2014, Juan's sister told Maria that "Juan had bought a gun and that he planned to kill [Maria]." *Id.* at 333. The events of that year indicate that the government had not effectively gained control over Juan.

Moreover, that Juan received a fine of approximately $200 for beating up their oldest child (from a judge who no longer works in town, at a courthouse that has since been destroyed) may indicate some willingness of the Guatemalan government to control Juan but it does not indicate its ability to do so. The concurrence points to the restraining order and fine as evidence

Guatemala is willing to enforce its laws but may not always be successful.[4]   While the concurrence would emphasize what Guatemala did, it is more important to look at the numerous instances when the government failed to act or even respond as well as the harm the government failed to prevent.  The death threats Maria received continued even after Juan was fined.  And Juan's purchasing of a gun—which ultimately led Maria to flee—came after Juan was fined.  Moreover, the police failed to respond to Maria's calls for help on two occasions when Juan came to Maria's house and threatened her and/or their children.  In reviewing this evidence, the immigration court opined that it "would be left to wonder if Juan intended to kill the respondent, the mother of his four children, why would he not have done so."  AR 70, Immigration Ct. Order.  But it cannot be that an applicant must wait until she is dead to show her government's inability to control her perpetrator.

The supplemental evidence regarding Guatemala's country conditions corroborates that Maria could not "reasonably expect the assistance of the government" in controlling Juan's actions.  *Al-Ghorbani*, 585 F.3d at 998; *see In re S-A-*, 22 I. & N. Dec. 1328 (BIA 2000).  The evidence Maria submitted shows that "[t]he systemic marginalization of indigenous communities . . . continues with no meaningful efforts by the government to overcome it."  AR 285, State of the World's Minorities and Indigenous Peoples 2015—Guatemala.  It also indicates that "[i]mpunity for perpetrators remain[s] very high," AR 255, Country Reports on Human Rights Practices for 2016, and that for Mayan indigenous women, there is "increased vulnerability and gender-based violence . . . exacerbated by a weak state apparatus that struggles to implement laws and programming to protect these groups."  AR 274, Guatemala Struggles to Protect Women Against Endemic Violence.  Indigenous Mayan women are particularly unable to seek help from the government because they speak a different language from most of the country's authorities.  To be sure, the supplemental material does not indicate *no* willingness on behalf of the Guatemalan government—indeed, the country has taken some steps to codify laws prohibiting violence against women—but rather, the material reinforces the country's lack of

---

[4]The concurrence's reference to the enforcement of domestic abuse law violations in this country is both inapt and irrelevant.

resources and infrastructure necessary to protect indigenous Mayan women from their perpetrators.

Further, the Board's conclusion that Maria did not meet her burden of showing that the Guatemalan government was "helpless" relies on a standard that has since been deemed arbitrary and capricious. AR 5, BIA Decision. The United States District Court for the District of Columbia found that the "complete helplessness" standard is arbitrary, capricious, contrary to law, and "not a permissible construction of the persecution requirement." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 130 (D.D.C. 2018).

Thus, the Board's conclusion that Maria did not demonstrate that the Guatemalan government was unwilling or unable to control Juan is not supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Zhao*, 569 F.3d at 247 (quoting *Koulibaly*, 541 F.3d at 619). Maria's testimony about her experiences, corroborated by supplemental evidence of the conditions for indigenous Mayan women in Guatemala, compels a contrary conclusion to that of the Board. *See Mandebvu*, 755 F.3d at 424. Based on the evidence in the record, Maria could not "reasonably expect the assistance of the government" in controlling Juan's actions. *Al-Ghorbani*, 585 F.3d at 998. We therefore vacate the Board's finding that Maria did not show that the government was unable or unwilling to protect her and remand so the agency can reconsider her application consistent with this opinion.

3.

Next, the Board found that even if Maria established that she suffered past persecution, entitling her to a presumption of a well-founded fear of future persecution, the government rebutted this presumption by demonstrating that "it is reasonable for the respondent to safely relocate to avoid persecution within Guatemala." AR 4, BIA Decision. On appeal, Maria argues that the government's conclusion is not supported by substantial evidence. We agree.

When "an applicant has demonstrated past persecution, 'it shall be presumed that internal relocation would not be reasonable, unless the [government] establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.'" *Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 35 (BIA 2012) (quoting 8 C.F.R.

§ 1208.13(b)(3)(ii)).  Thus, to rebut the presumption of a well-founded fear of future persecution, the government must satisfy a two-part inquiry: (1) "whether '[t]he applicant could avoid future persecution by relocating to another part of the applicant's country,'" and (2) "whether 'under all the circumstances, it is reasonable to expect the applicant to do so.'"  *Id.* at 32 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)); *see also Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012).  Assessing whether internal relocation is reasonable "requires the consideration of numerous factors, including 'whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.'"  *Dieng*, 698 F.3d at 872 (quoting *Ghanim v. Holder*, 425 F. App'x 463, 467 (6th Cir. 2011)); *see also* 8 C.F.R. § 1208.13(b)(3).  This court has counseled that "State Department reports are generally the best gauge of conditions in foreign countries." *Dieng*, 698 F.3d at 872 (citing *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004)).

Here, as a preliminary matter, it is not clear that the Board applied the correct burden of proof.  First, the standard laid out by the immigration judge, which the Board adopted, is backwards.  The immigration judge stated that "it is the burden of [government] to show that internal relocation would not be possible or reasonable because there has been past persecution." AR 71, Immigration Ct. Order.  This is incorrect.  Rather, because the court found that "respondent did show that she experienced past persecution," AR 71, Immigration Ct. Order, it is the government's burden to establish, "by a preponderance of the evidence that, under all of the circumstances, it would be reasonable for the applicant to relocate."  *Matter of D-I-M-*, 24 I. & N. Dec. 448, 450 (BIA 2008).

It is possible that even though the Board did not re-articulate the standard, it actually flipped it correctly when it applied it.  But even if we assume that the Board recognized the immigration judge's error and attempted to apply the correct standard, it still failed to properly shift the burden.  Rather than evaluating whether the government showed that it would be reasonable for Maria to relocate to another part of Guatemala, the Board found that "the record does not show it would *not* be reasonable" for her to internally relocate.  AR 5, BIA Decision (emphasis added).  In other words, the Board found that the record does not show it would be

*unreasonable* for Maria to internally relocate instead of concluding that the government affirmatively showed that relocation would be *reasonable*. When an "[i]mmigration [j]udge [does] not explicitly apply the presumption and fail[s] to shift the burden of proof to the [government] to prove by a preponderance of the evidence that the respondent can avoid future persecution by relocating to another part of [her country], and that it would be reasonable for [her] to do so," the appropriate remedy is remand. *Matter of D-I-M-*, 24 I. & N. Dec. at 451.

Second, even if the Board did apply the appropriate standard—in another part of its decision, but without specifically noting that the government satisfied its burden, the Board concluded that "the record also shows that the respondent could relocate within Guatemala to avoid future persecution and it is reasonable to do so"—its finding that Maria could reasonably relocate within Guatemala was not supported by substantial evidence. AR 4, BIA Decision. Among other factors, reasonableness depends on "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." *Dieng*, 698 F.3d at 872 (quoting *Ghanim*, 425 F. App'x at 467). Here, although Guatemala has made some strides in its recognition of violence against Mayan indigenous women, the record does not indicate that other areas of Guatemala are materially safer or different from Huehuetenango. On the contrary, the evidence indicates that violence toward Mayan indigenous women is pervasive throughout Guatemala and is not limited to one particular region.

Within this broader context, Maria testified that "Juan has submitted a petition to try to locate [her] and order [her] to return to Guatemala." AR 326, I-589 Appl. She believes that "he wants [her] to return to Guatemala so that he can kill [her]." *Id.* Unless Maria cedes custody of her children—which she has testified she will not do—it is reasonable that she would continue to fear that Juan will "kill [her], and if not[,] that he would pay someone to do something" if she returns to Guatemala. AR 188, Immigration Ct. Tr. Further, the government did not submit any evidence indicating that Maria has friends, family, or job opportunities elsewhere in Guatemala. On the contrary, the record indicates that Maria's native language is that of the Mayan indigenous group, she wears Mayan clothing, and has lived in the Aldea Village her entire life,

with the exception of her time in the United States.  Maria has no formal education and she cannot read or write.  Moreover, because Maria is unwilling to cede custody of her children to Juan, it is unclear by what sort of arrangement she might be bound if she returned to Guatemala.  The government has not presented any evidence suggesting that she would be able to take her children to another part of Guatemala without fearing persecution by Juan or anyone he hired to harm her.  Thus, considering all the circumstances, the Board's conclusion that the government showed by a preponderance of the evidence that Maria could internally relocate and that it would be reasonable to expect her to do so is not supported by substantial evidence on the record.  We therefore vacate the Board's finding, both on the grounds that it failed to apply the proper burden-shifting analysis and that its decision was not supported by substantial evidence, and remand so the agency can reconsider Maria's application consistent with this opinion.

B.

After finding that Maria was not eligible for asylum, the Board concluded that "it follows that she did not satisfy the more stringent standard for withholding of removal."  AR 6, BIA Decision.  On appeal, Maria argues that "she meets the higher standard for withholding of removal for the reasons set forth [in the arguments regarding asylum]."  CA6 R. 15, Pet'r Br., at 40–41.  Pursuant to the INA, an applicant may be entitled to withholding of removal if she establishes a "clear probability" that she will be subject to persecution if forced to return to the country of removal.  *Mikhailevitch*, 146 F.3d at 391.

Where the immigration court "relie[s] solely on the finding regarding asylum in determining that [the applicant] could not meet the more stringent burden of establishing eligibility for withholding of removal," and does not "examine the evidence and make specific findings regarding the probability" of persecution with respect to the withholding of removal claim, this court does not have sufficient grounds to review the decision under the substantial evidence standard.  *Gilaj*, 408 F.3d at 289.  Rather, when this court remands to the agency to reconsider the asylum claim, the Board "should consider on remand whether petitioners are entitled to withholding of removal based on all of the evidence o[n] record."  *Id.*

Here, the immigration judge and Board relied solely on their finding regarding asylum to determine that Maria did not meet the more demanding standard of withholding of removal. Thus, because we remand for the agency to reconsider Maria's asylum claim, the Board should also consider "whether [Maria is] entitled to withholding of removal based on all of the evidence o[n] record." *Id.*

## C.

Last, the Board concluded that Maria waived her application for humanitarian asylum because "[t]his argument was not raised before the Immigration Judge." AR 6, BIA Decision. The board further "observe[d]," however, "that even accepting that the respondent suffered past persecution, it was not of a level to warrant humanitarian relief." *Id.* (citing 8 C.F.R. § 1208.13(b)(1)(iii)(A)). On appeal, Maria argues that the issue was not waived because humanitarian asylum is not a separate form of relief; rather, it is a discretionary form of relief that can be granted to applicants in certain circumstances. She further contends that she is entitled to humanitarian asylum on the merits.

Humanitarian asylum is available where "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or where "there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country" even without a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1)(iii). The latter is reserved for "rare instances" when the applicant "'has suffered under atrocious forms of persecution.'" *Hamida v. Gonzales*, 478 F.3d 734, 740 (6th Cir. 2007) (quoting *Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989)). This court reviews the Board's denial of humanitarian asylum for an abuse of discretion. *Mbodj v. Holder*, 394 F. App'x 239, 245 (6th Cir. 2010).

This court has not explicitly addressed whether an applicant waives her claim to humanitarian asylum when she does not explicitly request it separate from her overall past-persecution-based asylum claim. The First Circuit, however, has addressed this question. In *Ordonez-Quino*, the First Circuit explained that because humanitarian asylum is "not a separate form of relief created by the Immigration and Nationality Act," but rather "is a

discretionary form of relief that may be granted to certain asylum seekers," an applicant's eligibility for humanitarian asylum is not waived when she fails to independently request it on the basis of a past persecution claim. *Ordonez-Quino v. Holder*, 760 F.3d 80, 95 (1st Cir. 2014). Similarly, in an unpublished concurrence, Judge Rogers explained that the humanitarian asylum "does not create a separate claim for relief from removal" but rather that "this provision constitutes part of the regulatory scheme for determining whether an alien should be granted asylum." *Saliko v. Gonzales*, 207 F. App'x 570, 576 (6th Cir. 2006) (Rogers, J., concurring).

Thus, given that humanitarian asylum is one avenue to achieve asylum under the broader statutory scheme, rather than a distinct form of relief, we find that Maria's eligibility for humanitarian asylum was not waived. Accordingly, when the Board reconsiders the asylum claim on remand, it should also consider relief under the humanitarian asylum provision on the merits.

## IV.

For the reasons stated, we grant Maria's petition for review, vacate the Board's denial of her application for asylum, and remand to the Board for reconsideration consistent with our opinion. Accordingly, in reconsidering her application for asylum, the Board should review her argument for humanitarian asylum and application for withholding of removal.

---

**CONCURRING IN THE JUDGMENT**

---

BOGGS, Circuit Judge, concurring in the judgment.  I agree with the majority that this case must be remanded.  The IJ, the BIA, and the government in arguing before us, all relied on *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014).  That decision was abrogated by *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), which has in turn been ruled arbitrary and capricious by another court.[1]  The complication resulting from this ladder of authority counsels for remand. *See Moncada v. Sessions*, 751 F. App'x 116, 118 (2d Cir. 2018) (citing *Biao Yang v. Gonzales*, 496 F.3d 268, 278 (2d Cir. 2007)).

I write separately to highlight three areas where my emphasis would depart from the court's opinion. First, I note some ambiguity in the court's opinion's discussion of the category of "married indigenous women in Guatemala who are unable to leave their relationship."  I agree that the IJ and the BIA recognized this as a distinct social group in this case, relying on *Matter of A-R-C-G-*, 26 I. & N. Dec. at 338.  *But cf. Gonzales-Veliz*, 938 F.3d at 232 (*citing Matter of A-B-*, 27 I. & N. Dec. at 334–35) (both criticizing that particular social group definition as impermissibly circular).  However, it is not clear if the BIA and this opinion mean that the petitioner was unable to physically leave the relationship, which she clearly did, living apart from Juan for a year even before she fled to the United States.  Or does it mean unable to leave personal entanglement, which clearly did (and does) continue to some degree?  Or, as is sometimes adverted to in the opinion, that she was unable to legally leave the relationship, i.e., to get a divorce.  That has not happened—and may well not happen in very many situations where asylum would not be at all appropriate, as the remaining legal tie would have little or no impact.

---

[1]As the majority observes in footnote 3, p. 11, the District Court for the District of Columbia has ruled that *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) was arbitrary and capricious and has abrogated it.  *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018).  However, *Grace* (which is on appeal) arose in an unusual posture: one which treated the Attorney General's decision as a policy-making document and examined it under administrative-law standards. *See id.* at 116. We are, moreover, not bound by the decisions of an out-of-circuit district court.  I note the Fifth Circuit decision in *Gonzales-Veliz v. Barr*, 938 F.3d 219, 227–28, 234 (5th Cir. 2019), holding that the court was not bound by the D.C. district court's ruling and that the decision in *A-B-* was not arbitrary and capricious.

Next, as to the inability or unwillingness of Guatemala to protect women such as Maria, I note that the Guatemalan government here did issue a restraining order against Juan and fined him in a criminal proceeding on the one occasion shown in the record when he violated the restraining order by visiting Maria's residence in her absence and beating their daughter. It is an unfortunate truth that even in this country there are many occasions when our local governments have done no more than Guatemala did here, with far more tragic outcomes. And the court does at one point concede that Guatemala indeed tries to use the machinery of state to combat domestic violence—just not enough, in the majority's estimations:

> To be sure, the supplemental material does not indicate *no* willingness on behalf of the Guatemalan government—indeed, the country has taken some steps to codify laws prohibiting violence against women—but rather, the material reinforces the country's lack of resources and infrastructure necessary to protect indigenous Mayan women from their perpetrators.

Maj. Op. at 17 (emphasis in original). It seems a bit of a stretch to charge Guatemala with unwillingness to enforce its laws simply because it is not always successful. If that is the standard, the number of countries from which persecution could be claimed under this heading would undoubtedly multiply greatly.

Finally, I do not always agree with the coloring of some parts of the record in the court's opinion. To be sure, the immigration judge found Maria credible, and he did "adopt the testimony of the respondent as [his] factual findings." But some of the items mentioned in the opinion are hearsay: the instance that precipitated Maria's flight to the United States was her hearing from Juan's sister that her ex-husband intended to (or, in another version, *could*) kill her. And others are colored a bit. In this regard, on remand, the IJ and BIA will be within their rights to take additional evidence and make additional findings to which to apply the law as we have expounded it in this opinion.

With those qualifications, I concur in the court's judgment.