NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0242n.06

No. 21-3312

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

WENDY ZUNIGA-MARTINEZ; NERY YULISSA MEJIA-ZUNIGA; BYRON ANTONIO MEJIA-ZUNIGA,

   Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

   Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS

OPINION

Before: CLAY, GRIFFIN, and STRANCH, Circuit Judges.

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined. GRIFFIN, J. (pp. 15–23), delivered a separate opinion concurring in part and dissenting in part.

CLAY, Circuit Judge. Honduran native and citizen, Wendy Yulissa Zuniga-Martinez, individually and on behalf of her minor children, Nery Yulissa Mejia-Zuniga and Byron Antonio Mejia-Zuniga, petitions for review of an order of the Board of Immigration Appeals ("BIA;" "Board"), which dismissed her appeal from an immigration judge's denial of her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231, and relief under the Convention Against Torture ("CAT"), 8 C.F.R. § 208.16. For the reasons that follow, the petition for review is **GRANTED** as to asylum and withholding of removal under the INA, **DENIED** as to the dismissal of withholding of removal under CAT, the Board's order is **VACATED**, and the case is **REMANDED** to the BIA for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.    Factual Background

Before arriving in the United States, Zuniga owned a variety store in Olanchito, Honduras that opened in 2012. Six months after the store's opening, members of the Mara Salvatrucha gang ("MS-13;" "maras") started to surveil the store and demand Zuniga pay monthly "protection money" against robbery from rival gangs. Zuniga complied, even when the demanded amount went as high as 1,000 lempiras—a large increase from the first demand of 250 lempiras. Young teenagers were often dispatched to collect the fee, a common gang tactic that exploits the Honduran judicial system's relatively lenient treatment of youthful offenders. This pattern of extortion lasted from 2012 to 2015.

At her removal hearing, Zuniga testified that on one occasion, the maras robbed, beat, and left her husband tied up when he was en route to the village, where he worked as a merchant. This violence prompted her husband to flee to the United States with their son. Moreover, in May 2014, the maras murdered Zuniga's brother-in-law, Caesar Fernando Reyes, who owned a small business and whom the maras extorted.

In August 2015, around the time that her husband left Honduras, Zuniga closed her store due to the difficulty of complying with the maras' monthly extortion demands. Nevertheless, on two occasions, the gang members visited Zuniga's home (which was nearby her then-shuttered business) to demand ongoing protection money. As to why the extortion demands continued after she closed the shop, Zuniga testified that the MS-13 members likely assumed that she continued operations from her home. Zuniga did not pay the maras these times "because [she] could [not] pay the extortion money they were asking [her] for." (Tr., A.R. at # 108). The nature of the maras' surveillance and extortion shifted in another way as well once Zuniga's husband left Honduras.

She recalled that the maras said she could fulfill the extortion demands through sexual favors instead of monetary payment. (*Id.* at A.R. ## 127–28 ("Well, they tell you that if you don't have money[,] you can pay them with something else. . . . What I mean is if you don't give them the money . . . they want me to give them sex.")).

The gang's years of extorting and threatening Zuniga came to a head in December 2015. She had just picked up her daughter from school, and the pair were riding home on a motorcycle. MS-13 gang members, also on motorcycles, at least one of whom was armed, followed Zuniga and her daughter in close pursuit. The gang members asked Zuniga if she knew why they were following her. Zuniga lost control of the motorcycle, causing her and her daughter to fall to the ground and sustain severe injuries. As Zuniga lay injured on the ground, a mara, the same individual who monitored her business, warned her that it was "just a little taste of what can happen" should she continue to refuse their demands. (Tr., A.R. # 119).

Zuniga never reported any of these incidents—the extortion, threats, or the motorcycle encounter—to the police. She testified that the Honduran police act in concert with or acquiesce to MS-13, meaning filing police reports is often futile. Documentary evidence in the record likewise paints a picture of widespread corruption where gang members often operate with impunity. Zuniga testified to her fear that the extortion would reoccur were she forced to return to Honduras.

### B. Procedural Background

On May 29, 2016, Zuniga and her daughter entered the United States without inspection. The Department of Homeland Security ("DHS") apprehended them and issued each a Notice to Appear ("NTA") on May 31, 2016, charging them with a violation of INA § 212(a)(6)(A)(i). Zuniga's son previously entered the country without inspection with his father on August 14, 2015

and was issued an NTA with the same charge of removability on August 16, 2015. DHS has since removed Zuniga's son's father from the United States. The three remaining cases were consolidated for review.

On April 3, 2019, Zuniga appeared and testified before the immigration judge, and the parties stipulated to her credibility. In an oral decision, the immigration judge found that Zuniga established membership in two cognizable social groups, i.e., a Honduran small business owner and a female Honduran small business owner. These memberships were "basically immutable" characteristics. (Immigr. J. Decision, A.R. # 54). Even to the extent that being a business owner was mutable, the immigration judge reasoned that one "should not be required to change the fact that [she] [is] a business owner." (*Id.*). Therefore, Zuniga's "fears [were] objectively reasonable based upon gang activity and police corruption and crime and violence in Honduras." (*Id.*). The harm Zuniga suffered thus "d[id] []rise to the level of persecution." (*Id.*).

Nevertheless, Zuniga failed to establish a grantable case for two reasons. For one, the immigration judge found that Zuniga could not show a nexus between her two social groups and the harm that she suffered. Zuniga was "being targeted by the MS[-13] gang for economic gain," rather than her status as a Honduran small business owner or a female Honduran small business owner. (*Id.* at A.R. ## 55–56). Next, the immigration judge determined Zuniga's failure to report the extortion and assault incidents to the police "undercuts any claim that the government of Honduras would be unable or unwilling to protect [her]" because "not all the police in the entire country are corrupt." (*Id.* at A.R. # 56). As a result, Zuniga's internal relocation within Honduras would be "possible and reasonable." (*Id.* at A.R. # 57). The immigration judge denied the applications for asylum and withholding of removal and relief under the CAT.

On November 5, 2020, Zuniga appealed the immigration judge's decision to the BIA. The resulting March 11, 2021 decision found no clear error in the immigration judge's finding that gang members targeted Zuniga solely to acquire wealth. It reasoned that "an alien's fear of criminality is not a basis for asylum," meaning that Zuniga failed to show a nexus between her fear of persecution and membership in the particular social groups. (BIA Decision, A.R. # 447). Zuniga was also ineligible for withholding of removal under the INA because she failed to "establish[] that a reason that gang members have or may target her is on account of her membership in the putative particular social group." (*Id.*). Lastly, the BIA concluded that Zuniga's arguments under CAT were waived.

## II.    DISCUSSION

### A.    Standard of Review

This Court has jurisdiction to review a final removal order issued by the BIA under 8 U.S.C. § 1252. *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016). "Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, . . . [this Court] review[s] the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). "[T]o the extent the BIA adopted the immigration judge's reasoning, this [C]ourt also reviews the immigration judge's decision." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (citing *Khalili*, 557 F.3d at 435). The BIA's factual findings are reviewed under the "substantial evidence" standard. *Marikasi*, 840 F.3d at 286 (quoting *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012)). Under this standard, "[r]eversal is warranted only when the evidence not only supports a contrary conclusion[] but

indeed *compels* it." *Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014)).

### B.    Immigration Court's Exercise of Jurisdiction

Zuniga's jurisdictional argument pursuant to *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021) is without merit.  In *Niz-Chavez*, the Supreme Court addressed "[w]hat qualifies as a notice to appear sufficient to trigger the stop-time rule," a rule which governs whether a non-lawful resident's removal order should be canceled. *Id.* at 1479.  Zuniga urges the dismissal of the entire removal proceedings for lack of jurisdiction because the originally issued NTAs lacked the date and time of the hearing.  However, this Court's precedent forecloses this argument because such omissions in an NTA do not deprive an immigration judge of jurisdiction to adjudicate a case. *Rafael v. Garland*, 15 F.4th 797, 801 (6th Cir. 2021) (citing another source) ("For jurisdictional purposes, it is not necessary that the [NTA] contain all the required information or that all the information be included in a single document.").  Because Zuniga received subsequent notices with the time and date of the hearing, the immigration judge had jurisdiction.  To the extent that Zuniga argues that the agency failed to comply with an adequately invoked claims-processing rule, this Court lacks jurisdiction to consider it, given that it is raised for the first time on appeal, and it is thus untimely. *See Hih v. Lynch*, 812 F.3d 551, 554 (6th Cir. 2016).

### C.    Legal Principles of Asylum and Withholding of Removal

To receive asylum, Zuniga must show that she is a "refugee." *See* 8 U.S.C. § 1158(b).  A "refugee" is someone "who is unable or unwilling to return to [her] home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quoting *Bonilla-Morales v. Holder*, 607 F.3d 1132,

1136 (6th Cir. 2010)). Therefore, as relevant here, Zuniga bears the burden of establishing: (1) past persecution or a well-founded fear of future persecution, where that persecution is "on account of" membership in a particular social group; (2) a nexus between the persecution and the protected ground; and (3) the persecution was committed by non-government actors whom the government was unable or unwilling to control. *Pilica v. Ashcroft*, 388 F.3d 941, 950–51 (6th Cir. 2004).

To qualify for withholding of removal under the INA, a petitioner must similarly establish that if removed to her country of origin, her "life or freedom would be threatened" based on her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An applicant seeking withholding of removal faces "a more stringent burden than what is required on a claim for asylum," and must demonstrate "that there is a clear probability that [s]he will be subject to persecution if forced to return to the country of removal." *Pilica*, 388 F.3d at 951 (citations omitted).

For the following reasons, the BIA's decision to affirm the immigration judge's denial of asylum and withholding of removal under the INA is not supported by substantial evidence.

### 1. Past Persecution

To establish refugee status based on past persecution, Zuniga must demonstrate being harmed on account of a protected ground. The immigration judge found that Zuniga experienced harm rising to the level of persecution "because there was a physical injury [during the motorcycle incident] with some severe wounding to [Zuniga's] leg[,] . . . along with the four years of extortion demands from the gangs." (Immigr. J. Decision, A.R. # 54). Nevertheless, it went on to find that Zuniga had not shown "past persecution because what is missing was this lack of government action or inaction." (*Id.* at A.R. # 56). The immigration judge's determination that Zuniga failed to establish past persecution is not supported by the record. "[P]ersecution 'requires more than a

few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.'" *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998)). In Zuniga's credible testimony, she discussed repeated harassment and extortion demands by MS-13, leading to the violent encounter on the motorbikes. These instances surpass mere harassment or an unfulfilled threat. Indeed, Zuniga describes regular threats and acts of extortion; she testified: "[B]ecause I couldn't pay the extortion money [MS-13 members] were asking me for, they attempted against my life." (A.R. at # 108). Considering the harms suffered cumulatively, the determination that Zuniga failed to demonstrate past persecution is not supported by substantial evidence; the record compels a contrary conclusion. *Haider v. Holder*, 595 F.3d 276, 286 (6th Cir. 2010).

### 2. Nexus

An asylum applicant must also show that she was persecuted on account of her membership in the particular social group. 8 U.S.C. § 1231(b)(3)(A). In applying this nexus test, the immigration judge and the Board agreed that Zuniga failed to draw a sufficient connection between the particular social groups (i.e., a small Honduran business owner and a female Honduran small business owner) and the harm inflicted upon her. Instead, the agency courts found Zuniga was "being targeted by the MS[-13] gang for economic gain, for money, and really for no other reason." (Immigr. J. Decision, A.R. # 55). Substantial evidence does not support the BIA's conclusion that Zuniga failed to establish the required nexus between her membership and persecution by the gang members.

Specifically, the record seems to indicate that small business owners and female small business owners in Honduras are particularly vulnerable to gang violence by extortion. The record

shows that "protection payments" are used by the maras to "reaffirm control over poor urban enclaves." (Int'l Crisis Grp., Mafia of the Poor: Gang Violence and Extortion in Cent. Am. (2017), A.R. ## 222–55; *see also id.* at A.R. # 224 ("Extortion schemes . . . depend on coercive control over communities and businesses"); *id.* at A.R. # 257 ("Gang members typically extort store owners for between 200 and 600 lempiras . . . per month . . . . However, the charges can be much higher.")). Consequently, "in Honduras[,] the Chamber of Commerce no longer publishes a registry of its members." (Int'l Crisis Grp., Mafia of the Poor, A.R. # 227). Small business owners are particularly vulnerable because they cannot afford private security. (*Id.*; *see* Tr., A.R. # 136 ("Larger businesses have mostly avoided this problem because they have the money to pay for private security services[.]")).

The exhibits in the record also suggest that female small business owners are uniquely exposed to maras' extortion tactics. (U.S. Dep't of State, Honduras 2018 Hum. Rts. Rep., (2018), A.R. at # 193 ("Extortion . . . and other threats and violence directed against . . . women, and members of vulnerable populations."); Int'l Crisis Grp., Mafia of the Poor, A.R. at # 241 ("[W]ith women making up the largest share of victims.")). It would seem to follow that because the gang members were keen to accept sexual favors in lieu of monetary payment from Zuniga, the Board's finding that Zuniga was targeted only for financial gain is undermined. (*Compare* Tr., A.R. # 306 ("The gang noticed that [her husband] would leave town, and [she] stayed alone with the business."), *with* Int'l Crisis Grp., Mafia of the Poor, A.R. # 243 ("Male control over female bodies . . . [is] integral to gang culture.")).

Nor did the Board consider that the harassment and extortion began only when Zuniga opened her shop, a factor this Court has found counsels towards proof of nexus. *Cf. Bonilla-Morales*, 607 F.3d at 1138 ("[T]he incidents that predate Carlos'[] recruitment appear to be more

severe than those that occurred after he refused to join the gang."). The testimony and evidence on the record separate Zuniga's claim from a scenario where an asylum applicant bemoans general lawlessness and criminality. *Cf. Sanchez-Robles*, 808 F.3d at 692. Taken together, the evidence corroborates rather than undermines a nexus between the persecution and membership in a particular social group. The BIA's finding to the contrary is thus not supported by substantial evidence; rather, the record compels a finding that Zuniga was persecuted as a result of her membership in a particular social group. Consequently, the BIA erred by concluding that Zuniga had not established the requisite nexus between her past persecution and her membership in her social groups.

### 3. Country Conditions and Government's Ability to Control

An immigration judge should consider evidence of the country's conditions, particularly where an asylum applicant does not report alleged persecution to the authorities. *K.H. v. Barr*, 920 F.3d 470, 476 (6th Cir. 2019). In this case, the Board did not discuss evidence of country conditions at all. The immigration judge did conclude that "not all the police in the entire country are corrupt." (Immigr. J. Decision, A.R. # 56; *id.* ("[T]he respondent must show that the government of Honduras either condoned the actions of the MS gang, or showed an inability to protect the victims[.]")). In so finding, the immigration judge emphasized that Zuniga did not report the incidents of extortion or acts of intimidation or physical violence to the police department. (*Id.* ("[I]n this case, having never made any report to anyone, that simply has not been done.")). Because neither the BIA nor the immigration judge addressed the documentary evidence of the country conditions that Zuniga submitted, and because it is entirely unclear whether the immigration judge or BIA analyzed the evidence in the context of determining whether the

government was unable or unwilling to protect Zuniga, the agency's finding is not supported by substantial evidence. *Zometa-Orellana v. Garland*, 19 F.4th 970, 980 (6th Cir. 2021).

That documentary evidence, including a Country Report from the U.S. Department of State, substantiates Zuniga's credible testimony that she believed that the police would not act in any meaningful way to protect her. *Juan Antonio v. Barr*, 959 F.3d 778, 796 (6th Cir. 2020) ("This [C]ourt has counseled that State Department reports are generally the best gauge of conditions in foreign countries.") (citations omitted)). In support of that position, the reports submitted appear to demonstrate that the Honduran "government lacks the resources to address crime and violence fully." (U.S. Dep't of State, Honduras 2018 Crime & Safety Rep. (2018), A.R. # 179; *see also id.* at A.R. # 193 (U.S. Dep't of State, Honduras 2018 Hum. Rts. Rep., (2018) ("Impunity existed in many cases . . . as evidenced by . . . [the] few convictions of perpetrators[.]"); *id.* at A.R. # 195 (reviewing gang "intimidation of police."); *id.* at A.R. # 199 ("Corruption and impunity remained serious problems within the security forces.")). Reporting crimes is often futile as "police may take hours to arrive at the scene of a violent crime or may not respond at all. As a result, criminals operate with a high degree of impunity." (U.S. Dep't of State, Honduras 2018 Crime & Safety Rep. (2018), A.R. # 188; *see also id.* at A.R. ## 207–08 ("Anticorruption efforts continued to lag[.]"). The evidence of country conditions seems to show that "[i]n a context of competitive violence between rival *maras* and a flawed or absent state—with police lacking equipment . . . [i]nstitutional flaws in the security and justice systems are evident[.]" (Int'l Crisis Grp., Mafia of the Poor, A.R. ## 240, 245).

Neither the BIA nor the immigration judge grappled with the significance of those reports in the context of Zuniga's failure to report the harm suffered to the Honduran authorities in the first instance. *See Zometa-Orellana*, 19 F.4th at 980. Because the Board did not address these

issues, we leave them to the Board to consider in the first instance on remand. In particular, the BIA should assess the sufficiency of this evidence and consider whether it establishes that the Honduran Government is unable or unwilling to act.

### 4. Internal Relocation

If an applicant establishes past persecution, she is entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.12(b)(1). If unable to show past persecution, and where the national government is *not* the alleged persecutor, then the asylum applicant bears the burden of showing that the persecution is not geographically limited in such a manner that relocation within the country of origin would be unreasonable. 8 C.F.R. § 1208.13(b)(3)(i).

We need not assess Zuniga's ability to relocate within Honduras because the record compels a finding that she experienced past persecution, entitling her to the presumption as to future persecution. Instead, the government must bear the burden of establishing by a preponderance of the evidence either that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds . . . upon the applicant's removal to that country," or that "[t]he applicant could avoid a future threat to [her] . . . life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *Stserba v. Holder*, 646 F.3d 964, 975–76 (6th Cir. 2011) ("After a petitioner demonstrates past persecution, the government may rebut the presumption[.]"); 8 C.F.R. § 208.16(b)(1)(i) and (ii). On remand, therefore, the Board is entitled to determine whether the government has rebutted the presumption of a well-founded fear of future harm in the first instance.

### 5. Withholding of Removal

The immigration judge denied Zuniga's application for withholding of removal under the INA because Zuniga had failed to prove her eligibility for a grant of asylum. However, since the Board erred in deciding that Zuniga failed to prove her eligibility for a grant of asylum, this Court also vacates the denial of Zuniga's application for withholding of removal. Because Zuniga's withholding claim rests on the same facts as her asylum claim, the agency should also consider the former on remand.

### D. Convention Against Torture

Zuniga additionally requested relief under CAT. To obtain withholding of removal under the CAT, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The Board determined that Zuniga waived review of her request to withhold removal under the CAT because she failed to raise a meaningful challenge during her administrative appeal. This Court agrees and denies the petition to review on that basis.

### E. Right to Due Process

A non-resident individual in removal hearings is entitled to the Fifth Amendment guarantee of due process. *Huicochea–Gomez v. INS,* 237 F.3d 696, 699 (6th Cir. 2001). On appeal, Zuniga argues that a defect in the removal proceedings occurred because the immigration judge and the Board failed to properly consider the supporting documentation and corroborating evidence. Zuniga waived any due process claim. *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006) ("[O]nly claims properly presented to the BIA and considered on their merits can be reviewed by this [C]ourt in an immigration appeal.") (quoting another source). That aside, it is unlikely Zuniga could show a deprivation of due process of a constitutional magnitude. This portion of Zuniga's

appeal is dismissed for lack of jurisdiction.  *Fang Huang v. Mukasey*, 523 F.3d 640, 650 (6th Cir. 2008).

### III.   CONCLUSION

For the foregoing reasons, this Court **GRANTS** in part and **DENIES** in part the petition for review, **VACATES** the Board's order, and **REMANDS** for further proceedings in accordance with this opinion.

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

Petitioner Wendy Yulissa Zuniga-Martinez is a Honduran citizen who entered the United States illegally. When immigration authorities sought to deport her, she applied for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and withholding of removal under the Convention Against Torture ("CAT"). An immigration judge ("IJ") denied her application and the Board of Immigration Appeals ("BIA") dismissed her subsequent appeal. Zuniga now petitions for review of the BIA's final order.

Although I agree with the majority that the agency had jurisdiction to consider Zuniga's application and that she forfeited her CAT claim and due-process argument, I disagree with its holding that substantial evidence does not support the agency's factual findings. Accordingly, I respectfully dissent from the majority's decision to grant in part Zuniga's petition.

I.

Like many small business owners in Honduras, Zuniga was extorted by the violent criminal organization MS-13. She testified extensively about her experience. Every month, gang members would show up at her store and demand "protection money." The amount depended on how well they thought her business was doing. According to Zuniga, MS-13 extorted her fellow business owners and "other people" in this way too. In her words, "[t]hey extort people – other people – any person that has the business. People that ha[ve] little stores and sell food or sell other things. They extort everybody." She also described MS-13's tactics as charging "rent" to anyone who has "a small business" or a "nice house" because "they think you have money." Zuniga confirmed that "[s]o long as they believe that you have money[,] they would charge you rent" and that the gang's "main goal is just to get money from you[.]" When asked whether MS-13 extorted only business owners, Zuniga replied, "[w]hat they want is money." She also explained that none of

the gang's victims reported its extortion because the police "didn't listen," "don't do anything," and are sometimes "with them."

Zuniga's husband worked with her at the store. Every day, he would take goods to local villages to sell. On one of these trips, MS-13 intercepted him, robbed him of his money and wares, and left him "beat up" and "tied up" in an isolated area. This robbery came shortly after the gang killed his brother, who was also a merchant. Zuniga's husband fled to the United States, leaving his family in Honduras.

Once her husband left, MS-13 bothered Zuniga "more often" and demanded "more money." The gang also began insinuating that she could pay her "rent" by having sex with them if she did not have the money. Zuniga never had sex with a gang member.

Zuniga paid MS-13 for about three years, until she closed her store. Despite Zuniga no longer owning a business, MS-13 continued to threaten her: gang members came to her house and demanded that she "continue giving them money" because "[t]hey thought [she] had enough money to continue paying them." Zuniga testified that MS-13 reached this conclusion because "they knew that [her] husband was . . . in the United States," and "thought that [she] was going to open the business somewhere else" or "was selling from [her] house." After Zuniga refused to pay, gang members caused her to crash her motorcycle, warning that this violence "was just a taste of what can happen" if she did not pay. Soon after this altercation, Zuniga fled to the United States.

At the immigration hearing, Zuniga testified that, if she returned to Honduras, "the same thing would happen" "[b]ecause once people go back and they see that you're coming from here they think that you have money." She further explained that MS-13 would harm her again "[b]ecause they think that if I go back[,] I'm going to start my business again and I'm going to have money, but I don't have money."

II.

Zuniga paints a grim picture for Honduran small business owners. But to receive the relief she seeks, she must demonstrate that she was "persecuted on account of or because of" her membership in a protected category, such as a particular social group. *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis omitted). This means that she must establish a nexus between membership in her purported social group and the alleged persecution that she suffered. *See, e.g.*, *Zaldana-Menijar v. Lynch*, 812 F.3d 491, 500 (6th Cir. 2015). And, to qualify as "persecution," the harm she suffered must be "sufficiently tied to a country's government." *Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021). Because her harm was caused by non-governmental actors, Zuniga must show that the Honduran government is "unable or unwilling to control" the gang members who extorted her. *Id.*

The IJ found, and the BIA agreed, that there was no nexus between Zuniga's particular social groups (Honduran small business owners and female Honduran small business owners) and the alleged persecution she suffered. This is because, in the BIA's words, "gang members targeted [her] to acquire wealth." Or as the IJ put it, the MS-13 targeted petitioner "for economic gain, for money, and really for no other reason." Because "an alien's fear of criminality is not a basis for asylum" and because the record lacked a showing that the Honduran government could not or would not stop MS-13's actions, the agency determined that petitioner was not entitled to relief.

Because "the BIA review[ed] the immigration judge's decision and issue[d] a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). The BIA largely adopted the IJ's reasoning, however, so we also review the IJ's decision. *Id.*

The agency's denial of Zuniga's application hinged on two factual findings: (1) that MS-13 targeted Zuniga for its financial gain, not because of her social group; and (2) that the Honduran government is not unwilling or unable to control the gang members who targeted Zuniga. We must deny Zuniga's petition for review if substantial evidence supports either of these findings. *Id.* The substantial-evidence standard requires us to defer to the agency's decision "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012). We may not grant a petition "simply because [we are] convinced that [we] would have decided the case differently." *Marikais v. Lynch*, 840 F.3d 281, 287 (6th Cir. 2016). Rather the agency's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007) (quoting 8 U.S.C. § 1252(b)(4)(B)).

In my view, substantial evidence supports both of the key findings.

A.

To begin, substantial evidence supports the conclusion that Zuniga was targeted for economic gain rather than some trait inherent to her social groups. Zuniga confirmed that MS-13's overriding concern is making money. AR 130 ("What they want is money.") MS-13 does not target business owners because they dislike business owners. Rather, as Zuniga's testimony demonstrates, MS-13 targeted her for the same reason it targeted people with "nice houses": "they think that you have money[.]" AR 131. Indeed, the gang's threats continued after she closed her business. Why? Because MS-13 "thought [she] had enough money to continue to pay them[.]" Zuniga also testified that MS-13 extorted "other people" besides business owners. AR 115-116. According to her, "they extort everybody." And if she returns to Honduras, she fears further

extortion because MS-13 will "think that [she] ha[s] money." Thus, a theme persists throughout Zuniga's testimony: MS-13 targeted her for money, not out of some animus to business owners.

There is also substantial evidence demonstrating that Zuniga's gender did not play a role in MS-13's decision to extort her. True, at one point, gang members stated that they would accept sex as payment for her "rent." But Zuniga's testimony makes clear that, even when MS-13 brought up sex, money was the priority. AR 128 ("What I mean is *if you don't give them the money* what they want is they want me to give them - they want me to give them sex." (emphasis added)). Moreover, the gang also targeted her husband and brother-in-law (both small-business men), which belies any claim that she was targeted because she was a female small business owner. Zuniga also testified that MS-13 did not discriminate when it came to extortion. AR 122 ("They extort everybody.").

In sum, Zuniga's testimony amply demonstrates that MS-13 targeted Zuniga because of her perceived wealth, not because she was a small business owner or a female small business owner. And even if we would not have reached this conclusion in the first instance, the record does not *compel* a contrary conclusion. *Ben Hamida*, 478 F.3d at 736. The agency's finding therefore passes muster.

This result accords with the outcome of petitions filed by applicants like Zuniga. We routinely deny review to petitioners who were targeted by gangs that sought only to enrich themselves or further their criminal goals. *See, e.g.*, *Kozhaynova v. Holder*, 641 F.3d 187, 195 (6th Cir. 2011) ("While these events are unfortunate, and may have occurred because of [petitioner's] status as a business owner, they are insufficient to establish persecution on the basis of . . . a protected social group[.]"); *see also Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019) (concluding that the evidence did not show that a gang's extortion was "motivated by a

particular animus toward the Cruz-Guzman family itself, as opposed to an ordinary criminal desire for financial gain"); *Reyes Almendarez v. Barr*, 817 F. App'x 35, 40 (6th Cir. 2020) (holding that non-citizens failed to show that their family connection "was at least one central reason" for their persecution as opposed to the gang's "general, criminal goal of enacting revenge on one who reports gang activities to the police"); *Lino-Sabio v. Barr*, 805 F. App'x 385, 387, 389 (6th Cir. 2020) (holding that substantial evidence supported an IJ's finding that a non-citizen "failed to demonstrate a nexus to a protected ground" and was more likely victimized by criminals with financial motives where she was threatened and attacked by a gang that demanded money); *Lorenzan-Monetepeque v. Barr*, 781 F. App'x 490, 494 (6th Cir. 2019) (concluding that a business owner failed to establish that she was a victim of persecution based on a social group rather than "indiscriminate mistreatment" (citation omitted)); *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 812 (6th Cir. 2019) (concluding that non-citizens failed to show persecution based on social groups where the evidence showed that they were extorted by a gang that was "motivated by a desire for profit."); *Contreras-Torres v. Holder*, 542 F. App'x 456, 458 (6th Cir. 2013) (per curiam) (concluding that a business owner was threatened "because of his earnings" rather than his status as a business owner).

Indeed, this case is identical in all material respects to *Alfaro-Urbina v. Barr*, where a Honduran grocer fled to the United States after she failed to pay protection money to "gang members with MS-13 tattoos." 813 F. App'x 205, 207 (6th Cir. 2020). She sought asylum and withholding from removal based on her membership in the purported social group of "Honduran business owners, who are Honduran business owners who refuse to cooperate with gangs." *Id.* We refused to disturb the immigration court's denial of her application because she "was a business owner who faced extortion threats from unidentified criminals," and "this Court and others have

consistently held that such heightened exposure to threats—which often accompanies business ownership—while regrettable, does not satisfy the statutory standard for the asylum or withholding on the basis of membership in a particular group." *Id*. at 209. And relying on the IJ's finding that "Honduras has a serious problem with crime and gangs," we noted that the petitioner "did not demonstrate that the gang members' targeting of her was on account of anything other than criminality and the desire of the gang to increase its stronghold on the Honduran populous." *Id*. at 210 (alterations omitted). In my view, this rationale applies with full force here.

Because substantial evidence supports the lack-of-nexus finding, we must—consistent with our case law—deny Zuniga's petition for review.

B.

Substantial evidence also supports the conclusion that the Honduran government was not unable or unwilling to control the gang members who targeted Zuniga. Critically, Zuniga admitted that she never told police that MS-13 was extorting her. "We have repeatedly upheld the [BIA's] rejection of a claim that the government was unable or unwilling to control a private party . . . because the asylum application did not notify the government of the abuse." *Ortiz*, 6 F.4th at 690 (collecting cases).

Moreover, the IJ noted that although Honduras experiences "conditions of crime and violence," its police still arrest gang members, and its justice system still jails them for their crimes. This is consistent with our precedent. Even in countries that experience widespread corruption and organized crime, the government's response in a specific case can demonstrate an ability and willingness to control the threat posed to the applicant. *See, e.g.*, *K.H. v. Barr*, 920 F.3d 470, 478 (6th Cir. 2019); *Reyes Almendarez*, 817 F. App'x at 41–42 (although "violent, gang-related crime in Honduras is a significant problem" and "police lack resources at times to respond effectively to

such crime," police "responded, investigated, offered protection at least once, and were able to make arrests of [gang] members" in petitioners' case). Faced with the reality that Honduras can (and sometimes does) protect individual citizens from gang violence, the agency reasonably concluded that Zuniga's failure to seek this protection meant that she could not establish that she faced government-sanctioned persecution.

Because substantial evidence supports the finding that the Honduran government was not unable or unwilling to prevent MS-13 from harming Zuniga, we must deny her petition.

III.

In my view, two errors underlie the majority's decision to grant Zuniga's petition. First, it essentially reviews the agency's factual determinations de novo and finds a lack of substantial evidence based on inferences that it independently draws from the record. This is not how we review administrative findings of fact. *See* 8 U.S.C. § 1252(b)(4)(B). Even if we would have decided Zuniga's agency proceedings differently, Congress has expressly prohibited us from ignoring the agency's judgment in favor of our own. We can only step in if the record *compels* "any reasonable adjudicator" to disagree with the decision that was made. *Id*. Although the majority cherry-picks parts of the record that seemingly favor Zuniga, it discounts other parts that support the agency's decision. Because, as I explain above, the record as a whole provides substantial evidence, we are barred from interfering with the agency's authority to find facts.

Second, the majority should not fault the agency for failing to explicitly address Zuniga's documentary evidence regarding the country conditions of Honduras. Zuniga failed to preserve this argument. She mentions this issue in a single sentence in her brief's fact section: "Unfortunately, the BIA and IJ did not point to any of these official documents and there is no indication that the information provided in these articles [was] considered by either the IJ or BIA."

Pet'r Br. 15. "[I]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.,* 29 F.4th 802, 815 (6th Cir. 2022) (ellipses omitted). Because Zuniga's argument on the agency's failure to explicitly consider documentary evidence is at best perfunctory, she has forfeited this issue. *Id.*

Even if Zuniga had developed this issue or we excused her forfeiture, *see Watkins v. Healy*, 986 F.3d 648, 667–68 (6th Cir. 2021), we do not require agency judges to "exhaustively analyze every individual piece of evidence and each individual subargument," *see Kilic v. Barr*, 965 F.3d 469, 474 (6th Cir. 2020). Instead, we ask only whether substantial evidence supports the agency's decision. Moreover, in Zuniga's case, the IJ specifically stated that he had "considered all the evidence of record in its entirety, regardless of whether specifically mentioned in the text of this decision or not." AR 50. Thus, the record is clear: the IJ considered Zuniga's documentary evidence—which showed only the general conditions in Honduras—and decided that her own credible testimony amply established the facts of her case. The BIA saw no reason to disturb those findings. Because the evidence does not compel a different conclusion, I would deny Zuniga's petition with respect to her requests for asylum and withholding of removal under the INA.

IV.

For these reasons, I respectfully concur in part and dissent in part. I would deny Zuniga's petition in its entirety.